## GARDELLA v. CHANDLER.

No. 98, Docket 21133.

United States Court of Appeals
Second Circuit.

Feb. 9, 1949.

CHASE, Circuit Judge, dissenting.

———◇———

Frederic A. Johnson, of New York City (Frederic A. Johnson, Edward H. Beck, Jr., both of New York City, of counsel), for appellant.

Willkie, Owen, Farr, Gallagher & Walton, of New York City, for appellees.

Baker, Hostetler & Patterson, of Cleveland, Ohio, for appellee William Harridge, individually and as President of The American League of Professional Baseball Clubs, a voluntary unincorporated association.

Hedges, Hoover & Tingley, of Columbus, Ohio, for appellee George M. Trautman, individually and as President of The National Association of Professional Baseball Leagues, described in the complaint herein as "The National Association of Baseball Leagues."

Edgar P. Feeley, of New York City, Raymond Jackson, of Cleveland, Ohio, and Mark F. Hughes, of New York City, for appellee National Exhibition Co.

Before L. HAND, Chief Judge, and CHASE and FRANK, Circuit Judges.

CHASE, Circuit Judge.

The appellant brought this suit to recover treble damages under Secs. 1, 2 and 3 of the Sherman Act, 26 Stat. 209, 15 U.S.C.A. §§ 1, 2 and 3, and under, as stated in the complaint, Secs. 2 and 3 of the Clayton Act, 15 U.S.C.A. §§ 13 and 14. Apparently he relies upon Sec. 4 of the Clayton Act, 38 Stat. 731, 15 U.S.C.A. § 15, and we shall so treat his complaint.

He is a professional baseball player who, while under contract to play exclusively with the ball club popularly called the New York Giants which is owned and operated by one of the appellees, the National Exhibition Company, a New York corporation, violated the terms of the hereafter mentioned reserve clause of that contract by playing professional baseball in Mexico. He was consequently barred for a period of years from playing with baseball clubs in what is known as "organized baseball" in accordance with the provisions of his contract with the National Exhibition Company and thus deprived pro tanto of his means of livelihood. This suit followed and the first issue presented by this appeal is whether the district court had jurisdiction of the cause of action under the Sherman and Clayton Acts. The complaint was dismissed solely on the ground that the court had no such jurisdiction and no other is claimed now. D.C., 79 F.Supp. 260.

The appellant undertook to allege three causes of action against the appellees who are Albert B. Chandler, individually and as the Commissioner of Baseball; Ford C. Frick, individually and as President of the National League of Professional Baseball Clubs, an unincorporated association; William Harridge, individually and as president of the American League of Professional Baseball Clubs, an unincorporated association; George M. Trautman, individually and as president of The National Association of Professional Baseball Leagues, an unincorporated association; and National Exhibition Company, before mentioned.

He alleged generally in support of each cause of action that "organized baseball" comprised two so-called major leagues known respectively as the National and the American and the so-called minor leagues made up of clubs composing leagues of eight grades based upon the respective abilities of the players in the several clubs in each of such leagues. There are eight clubs in each of the major leagues and each club plays during a season games at its home grounds and games at the home grounds of each of the others until each club has played approximately one hundred and fifty games. The winning club in each major league plays a series of games with the winning club in the other at the close of the season for what is called the world championship, and during the season selected players from the clubs in each league perform as a team in playing a similarly selected team in what is called an "all stars" game. The clubs in the National League are located in the following places where each owns or leases a baseball park where games are played. Boston, Mass.; New York, N. Y.; Brooklyn, N. Y.; Philadelphia, Pa.; Pittsburgh, Pa.; Cincinnati, Ohio; Chicago, Ill., and St. Louis, Mo. The clubs of the American League own or lease parks where games are played in the following places. Boston, Mass.; New York, N. Y.; Philadelphia, Pa.; Washington, D. C.; Cleveland, Ohio; Detroit, Mich.; Chicago, Ill.; and St. Louis, Mo. The individual clubs are owned by corporations organized under the laws of the respective states in which their parks are located. The minor leagues are composed of clubs in a similar way and these clubs play games in various cities in this country and Canada.

These leagues and the clubs comprising them have entered into agreements, designed to control the manner in which "organized baseball" shall be conducted, which require players to be bound to their respective clubs by what is known as the standard contract. The so-called major league agreement, among other things, gives to appellee Chandler supervisory and disciplinary power over the major leagues, their clubs and their players. The so-called major-minor league agreement gives him similar powers over the minor leagues, their clubs and their players. The standard player contract includes what is known as a reserve clause which requires,

a player who is under contract to play with any club to refrain, at the expiration of the period of his employment, from contracting to play for, or playing for, any other club other than the one to which he has been under contract or its assignee. Thus, and in other particulars which need not be presently described, the agreements in "organized baseball" have created a closely knit organization which was intended to, and does, dominate and control to a large extent the playing of professional baseball in this country, Canada, Cuba, Puerto Rico and Mexico.

In playing their games the teams of the various clubs perform in the ball parks already referred to and each game is ended in the park where it is begun. But in order to get to the park where the game is played some or all of the players, managers, coaches, and employees have to travel across state or foreign boundaries; and the equipment necessary for the traveling club, consisting of uniforms, bats, gloves, mitts, masks, chest protectors, shin guards, baseballs and the like is similarly transported.

The club owners charge admission fees for all games played and divide them with the other contesting clubs as agreed. They, or most of them, also sell for valuable consideration the right to broadcast play-by-play descriptions of the games over the radio and thus across state lines, and some of them sell the right to broadcast the games by television. Some of those to whom these broadcast rights are sold get, and use, the opportunity so provided to advertise goods, articles and commodities which are sold and distributed nationally and internationally.

Since my brothers agree that the judgment should be reversed I will now state what are but my own reasons for believing that it should be affirmed; (1) because a controlling decision of the Supreme Court requires it and (2) because, even if that decision is distinguishable, the allegations in the complaint fail to state a cause of action over which the district court had jurisdiction.

The issues here presented are, as the district judge recognized, decidedly not of first impression. This record is with the possible exception of the allegations as to the sale of broadcasting rights for radio and television, not different in any esssential from that before the Supreme Court in Federal Base Ball Club v. National League, 259 U.S. 200, 42 S.Ct. 465, 66 L.Ed. 898, 26 A.L.R. 357 in which it was held that major league ball clubs were not engaged in interstate trade or commerce within the scope of the antitrust laws. Even the possible exception just mentioned exists only if the sale of these radio and television broadcast rights differs in some material way from the sale of the exclusive right to send "play-by-play" descriptions of the games interstate over telegraph wires, for that feature was present in the previous case before the Supreme Court. In each instance by what is called the sale of rights the appellees made it possible for others to transmit information interstate. The playing of baseball games then created the subject matter concerning which information was sent by symbols carried by telegraph wires and translated into words just as such play now creates the subject matter concerning which information is sent through the air by impulses which are transformed either into words or pictures. So far as I can perceive, the difference in the method of transmission is without significance.

These appellees do not themselves broadcast anything nor do they do anything more by way of production of what is broadcast than was shown to have been done in the former case to "produce" what was described. Since the sellers of the rights to broadcast through the air do only what the sellers of the rights to send descriptions over telegraph wires did in the former case I can find no sound basis on the facts for distinguishing that case from this. It seems to me to have decided the precise question here presented and that it controls our decision.

It has never been expressly overruled, and I do not think it has been overruled by necessary implication by United States v. South-Eastern Underwriters Ass'n, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440, which reflected a trend in decision not apparent in Hooper v. People of State

of California, 155 U.S. 648, 15 S.Ct. 207, 39 L.Ed. 297, on which the court relied somewhat in deciding Federal Base Ball Club v. National League, supra. That decisions like Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122, and Mandeville Island Farms, Inc. v. American Crystal Sugar Co., 334 U.S. 219, 68 S.Ct. 996 show a wide reach of Congressional power under the Commerce Clause when Congress chooses to exert it cannot be gainsaid. And United States v. South-Eastern Underwriters Ass'n, supra, reiterates that Congress intended to put within the coverage of the Anti-Trust Acts everything which was interstate or foreign trade or commerce. But in none of these decisions mentioned nor in any others of the Supreme Court of which I am aware, save only Federal Base Ball Club v. National League, supra, has there been a definite holding that "organized baseball" is, or is not, trade or commerce within the meaning of those words in the Sherman and Clayton Acts. Moreover, the rule there stated has since been applied by analogy in another field. Hart v. B. F. Keith Vaudeville Exchange, 2 Cir., 12 F.2d 341, certiorari denied, 273 U.S. 704, 47 S.Ct. 98, 71 L.Ed. 849; Neugen v. Associated Chautauqua Co., 10 Cir., 70 F.2d 605. Furthermore, the case was recently cited and disinguished in North American Co. v. S. E. C., 327 U.S. 686, 694, 66 S.Ct. 785, 90 L.Ed. 945. See Sears v. Hassett, 1 Cir., 111 F.2d 961, 965; cf. Perkins v. Endicott Johnson Corp., 2 Cir., 128 F.2d 208, 218.

Under these circumstances it seems to me that our duty as a subordinate court is to follow the Federal Base Ball Club case. I find no necessary implication among the cases to which I have previously alluded or in any others that it has been overruled. All of them relate to activities quite unlike organized baseball and, though general language can be found in the opinions to indicate changes in methods of approach to decision, there is no actual decision so incompatible with that in Federal Base Ball Club v. National League, supra, as to displace the latter by mere weight of its authority. The interpretation of the anti-trust laws has hitherto been accomplished in a case by case manner which has given due effect to the particular facts and circumstances shown. I cannot find any authoritative definition of the words "trade or commerce" or "affecting trade or commerce" as used in the cases which is so comprehensive that this method can be dispensed with. The intricate nature of the various questions involved makes it apparently impossible to devise a formula which will automatically, so to speak, put any and all situations either within or without the coverage of the acts.

In dealing with such a unique aggregate as organized baseball and with a decision in respect to it which seems to be directly in point on the facts, we should not be astute in seeking to anticipate that the court which has the power to do so will change that decision. To do so would not only be an unwarranted attempt to usurp the authority of that court but would make its task in general much more difficult since it would lead to a constant alteration in the lower courts of its decisions on specific fact situations in the light of what would appear to be differing rules stated in the course of deciding later cases on different facts. We relied on Federal Base Ball Club v. National League, supra, in our recent decision in Conley v. San Carlo Opera Co., 2 Cir., 163 F.2d 310, and until, and unless, we are advised by competent authority that it is no longer the law we should continue to abide by it.

On the second point, it seems to me that cases which involve more that the regulation of trade and commerce per se, and rest upon the explicit control by Congress in other statutes of the production of goods for commerce or the control of labor relations, furnish but very slippery ground on which to base decision here. What those statutes have in common with the anti-trust acts which is now material, as I see it, is only that all were within the power of Congress to enact under the Commerce Clause. Const. art. 1, § 8. When it is said that Congess has exerted all the power it possessed in the anti-trust acts, Atlantic Cleaners & Dyers v. United States, 286 U.S. 427, 435, 52 S.Ct. 607, 76 L.Ed. 1204, it is meant only

that within the field there dealt with Congress meant to act fully, leaving other phases of its power under the Commerce Clause outside their scope.

The field covered was "restraint of trade" which had a well known meaning at common law and the words "or commerce between the several states" were added to put the restraints prohibited within constitutional limitations on Congressional power. The Supreme Court has never, so far as I know, applied the Sherman Act in any case unless it was of the opinion that there was some form of restraint upon commercial competition in the marketing of goods and services in interstate commerce which was within the category of restraints which were illegal at common law, though expressions may be found in opinions which seem to make adherence to this concept somewhat elastic. In any event, as recently as Apex Hosiery Co. v. Leader, 310 U.S. 469, 500, 501, 60 S.Ct. 982, 996, 84 L.Ed. 1311, 128 A.L.R. 1044, Mr. Justice Stone said, in speaking for the majority of the court, "In the cases considered by this Court since the Standard Oil case in 1911 some form of restraint of commercial competition has been the sine qua non to the condemnation of contracts, combinations or conspiracies under the Sherman Act, and in general restraints upon competition have been condemned only when their purpose or effect was to raise or fix the market price.[1] It is in this sense that it is said that the restraint, actual or intended, prohibited by the Sherman Act, are only those which are so substantial as to affect market prices. Restraints on competition or on the course of trade in the merchandising of articles moving in interstate commerce is not enough, unless the restraint is shown to have or is intended to have an effect upon prices in the market or otherwise to deprive purchasers or consumers of the advantages which they derive from free competition. Chicago Board of Trade v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 243, 62 L.Ed. 683; United States v. United States Steel Co., 251 U.S. 417, 40 S.Ct. 293, 64 L.Ed. 343, 8 A.L.R. 1121; Cement Manufacturers Protective Ass'n. v. United States, 268 U.S. 588, 45 S.Ct. 586, 69 L.Ed. 1104; United States v. International Harvester Co., 274 U.S. 693, 47 S.Ct. 748, 71 L.Ed. 1302; Appalachian Coals v. United States, 288 U.S. 344, 375 et seq., 53 S.Ct. 471, 479 et seq., 77 L.Ed. 825."

In the Mandeville case, supra, the Court was dealing with a situation which did have a substantial effect upon the prices of goods in the market and did deprive purchasers or consumers of advantages which would have been theirs under free competition. While the test of indirectness of effect was somewhat muted, and perhaps discarded, the substance or the so-called "rule of reason" was not. Whatever the activity and how it may be conducted, it is not within the prohibition of the anti-trust laws unless in some substantial way the prices of goods in interstate commerce are controlled to the detriment of the purchaser or consumer.

The complaint in this case shoots wide of that mark. The wrong alleged as the end result of the monopoly, or conspiracy to create a monopoly, in restraint of trade or commerce is the deprivation of the appellant of the opportunity to play baseball as a means of earning his livelihood. His services, or ability to work, are not subjects of trade or commerce within the anti-trust acts. Indeed, in Sec. 6 of the Clayton Act, 15 U.S.C.A. § 17, it is stated that, "The labor of a human being is not a commodity or article of commerce." Although this, to be sure, was inserted for a purpose not here germane it shows nevertheless that Congress did not intend in the anti-trust acts to cover restraints upon employment. Moreover, Congress has expressly dealt with that subject in other statutes like the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., and the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq.

Nor are there any allegations as to any monopoly to control, or any conspiracy

---

[1] See e.g. Ethyl Gasoline Corp. v. United States, 309 U.S. 436, 60 S.Ct. 618, 84 L.Ed. 852; United States v. Socony-Vacuum Oil Co., 310 U.S. at page 150, especially Note 59, 60 S.Ct. 811, 84 L. Ed. 1129 and cases cited.

to create one to control, the prices at which the rights to send descriptions of the games, visually or otherwise, are sold; and as much is true as to the advertising by the purchasers of those rights. Nor as to what effect, if any, such by-products of the games have upon the prices at which goods are sold in commerce or upon the purchasers and consumers of those goods. Nor that what is done in respect to broadcasting or telecasting the games has any causal connection with the damage the appellant alleges. See K. & K. Co. v. Special Site Sign Co., 9 Cir., 85 F.2d 742, certiorari denied, 299 U.S. 613, 57 S.Ct. 315, 81 L.Ed. 452.

I would affirm the judgment but as my brothers hold otherwise it is, for the reasons stated in their separate opinions, reversed and the cause is remanded for trial.

L. HAND, Circuit Judge.

The complaint alleges that the defendants make contracts with broadcasting and television companies by which these companies send across state lines play-by-play narratives, or moving pictures, of the games; and, although in Federal Baseball Club v. National League,[1] the record contained evidence that it was the custom to broadcast accounts of the games by telegraph, that was an incident of so little importance that the Court of Appeals merely mentioned it without comment and the Supreme Court did not even allude to it. Besides, the difference between the telegraphing of that time and present-day radio or television, even though it were no more than a difference of degree —which it is not—would be so great as for practical purposes to make a difference in kind. I shall not labor the argument that the transmission of these narratives and moving pictures is itself interstate commerce; the only debatable question is whether the defendants' connection with these activities makes them a part of their business, and enough a part of it to color the whole. As I understand it, they enter into contracts with broadcasting and television companies, by which for large payments they allow the companies to install suitable apparatus in the "ball-parks," by means of which the companies transmit the narratives and pictures to the outside public. It is not necessary to say whether one, who sells goods indifferently to all comers, is pro tanto engaged in interstate commerce, because a part of his customers come from another state and carry their purchases home. In such cases the seller's indifference to the destination of the goods may isolate him from their eventual destination; at least he cannot be said to have joined with the buyers in the interstate part of their purposes. True, the sale is a condition sine qua non of the buyers' ability to carry the goods out of the state; but, if that be enough, there is no apparent reason to end the regression of causes with the sale. Whether every department store is engaged in interstate commerce is a question I shall not undertake to answer; and this I may do, because the defendants' relation to broadcasting and television is quite different. The contracts with the companies are mutual arrangements in which each contributes its share to a common venture; the defendants furnish the spectacle and give the companies leave to enter and set up their apparatus on the grounds, by means of which they transform for transmission the air and light waves, which come from the playing-grounds and the players, or from the narrator who reports the game; and the transformed waves they send abroad either in a form for direct reception or otherwise. This interposition is of course necessary, when the auditory is at a distance; but for our purposes the result seems no different from direct transmission; and the situation appears to me the same as that which would exist at a "ball-park" where a state line ran between the diamond and the grandstand. Nor can the arrangements between the defendants and the companies be set down as merely incidents of the business, as were the interstate features in Federal Baseball Club v. National League, supra.[1] On the contrary, they are part of the business itself, for that consists in

---

[1] 259 U.S. 200, 42 S.Ct. 465, 66 L. Ed. 898, 26 A.L.R. 357.

giving public entertainments; the players are the actors, the radio listeners and the television spectators are the audiences; together they form as indivisible a unit as do actors and spectators in a theatre. I am therefore in accord with my brother Frank that the defendants are pro·tanto engaged in interstate commerce.

On the other hand, I cannot go along with his opinion, if I understand it, that these features of the business, no matter how insignificant they may prove, necessarily subject it as a whole to the Anti-Trust Acts. The plaintiff is asking damages for excluding him from his calling; and to succeed he must show that the defendants' conduct, by which he was injured, was itself subject to the law that he invokes. I do not mean that he must show that he was injured by the broadcasting and television; but he must show that those activities together with any other interstate activities mark the business as a whole. Certainly that was implied in Federal Baseball v. National League, supra,[1] itself; nobody questioned that many interstate activities were in fact involved in professional baseball; the Court merely thought them not important enough to fix the business—at large—with an interstate character. I can find nothing in the books since then, which leads me to think otherwise. Mabee v. White Plains Publishing Co.[2] did indeed hold that, quoad those newspapers which crossed a state line, the publisher was engaged in the "production of goods for commerce"; and it may be that employees concerned in the production of even so small a part of a total output are within the Fair Labor Standards Act. However that may be, I cannot believe that that decision was intended to overrule the repeated decisions that the Anti-Trust Acts do not cover all persons who engage to any degree whatever in interstate commerce. If so, we are wasting our time over the Baseball case for it was overruled sub silentio. When the case goes back for trial—assuming that it does so

upon our opinions—it will be necessary, as I view it, to determine whether all the interstate activities of the defendants —those, which were thought insufficient before, in conjunction with broadcasting and television—together form a large enough part of the business to impress upon it an interstate character. I do not know how to put it in more definite terms.

As I understand my brother Chase, he thinks that, even though the defendants' business be in general subject to the Anti-Trust Acts, the "reserve clause" is not in violation of them. For this he relies principally upon Apex Hosiery Co. v. Leader,[3] a case in which the Court found it unnecessary to decide whether labor unions were within the Acts. The Court thought that, although the strike in question might well have had an effect upon the price of stockings which passed into interstate commerce, the purpose of the strikers was not that, and the result, if any, was only an incident. Be that as it may, whatever other conduct the Acts may forbid, they certainly forbid all restraints of trade which were unlawful at common-law, and one of the oldest and best·established of these is a contract which unreasonably forbids any one to practice his calling. I do not think that at·this stage of the action we should pass upon the "reserve clause"; and therefore I do not join in my brother Frank's present disposition of it, although I do not mean that I dissent from him. All that I wish now to decide is that the complaint avers enough to present an issue upon a trial. I think that the judgment should be reversed and the cause should be remanded for trial.

### FRANK, Circuit Judge.

1. No one can treat as frivolous the argument that the Supreme Court's recent decisions have completely destroyed the vitality of Federal Baseball Club v. National League, 259 U.S. 200, 42 S.Ct. 465, 66 L.Ed. 898, 26 A.L.R. 357, decided twenty-seven years ago, and have left that

---

[1] 259 U.S. 200, 42 S.Ct. 465, 66 L. Ed. 898, 26 A.L.R. 357.

[2] 327 U.S. 178, 66 S.Ct. 511, 90 L.Ed. 607.

[3] 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044.

case but an impotent zombi. Nevertheless, it seems best that this court should not so hold.[1] However, in Ring v. Spina, 148 F.2d 647, 651, 160 A.L.R. 371, referring to that case and another similar case,[2] this court said that, because of "the steadily expanding content of the phrase 'interstate commerce' in recent years; * * * there is no longer occasion for applying these earlier cases beyond their exact facts." For reasons stated later, I think that, on its facts, we can properly distinguish the suit now before us from the Federal Baseball case.

I think it should be so distinguished, if possible, because (assuming, as we must, at this stage of the litigation, the truth of the statements in the complaint) we have here a monopoly which, in its effect on ball-players like the plaintiff, possesses characteristics shockingly repugnant to moral principles that, at least since the War Between the States, have been basic in America, as shown by the Thirteenth Amendment to the Constitution, condemning "involuntary servitude," and by subsequent Congressional enactments on that subject.[3] For the "reserve clause," as has been observed, results in something resembling peonage of the baseball player. By accepting the "reserve clause"—and all players in organized baseball must "accept" it—a player binds himself not to sign a contract with, or play for, any

[1] I reach that conclusion somewhat hesitantly. For, while the Supreme Court has never explicitly overruled the Federal Baseball Club case, it has overruled the precedents upon which that decision was based; and the concept of commerce has changed enough in the last two decades so that, if that case were before the Supreme Court de novo, it seems very likely that the Court would decide the other way. This court cannot, of course, tell the Supreme Court that it was once wrong. But "one should not wait for formal retraction in the face of changes plainly foreshadowed;" this court's duty is "to divine, as best it can, what would be the event of the appeal in the case before it." L. Hand, C. J., dissenting in Spector Motor Service Co. v. Walsh, 2 Cir., 139 F.2d 809, 823. In Perkins v. Endicott Johnson Corp., 2 Cir., 128 F.2d 208, 217, 218, we said: "Legal doctrines, as first enunciated, often prove to be inadequate under the impact of ensuing experience in their practical application. And when a lower court perceives a pronounced new doctrinal trend in Supreme Court decisions, it is its duty, cautiously to be sure, to follow not to resist it." In Picard v. United Aircraft Corp., 2 Cir., 128 F.2d 632, 636, we said per L. Hand, J.; "In this we recognize 'a pronounced new doctrinal trend' which it is our 'duty, cautiously to be sure, to follow not to resist.'"

In Barnette v. West Virginia State Board of Education, D.C., 47 F.Supp. 251, 252, 253 Judge Parker, sitting in a three-judge court, said: "Ordinarily we would feel constrained to follow an unreversed decision of the Supreme Court of the United States, whether we agreed with it or not. * * * The developments with respect to the Gobitis case, [Minersville School Dist. v. Gobitis, 310 U.S. 586, 60 S.Ct. 1010, 84 L.Ed. 1375, 127 A.L.R. 1493], however, are such that we do not feel that it is incumbent upon us to accept it as binding authority. Of the seven justices now members of the Supreme Court who participated in that decision, four have given public expression to the view that it is unsound, the present Chief Justice in his dissenting opinion rendered therein and three other justices in a special dissenting opinion in Jones v. City of Opelika, 316 U.S. 584, 62 S.Ct. 1231, 1251, 86 L.Ed. 1691, [141 A.L.R. 514]. The majority of the court in Jones v. City of Opelika, moreover, thought it worth while to distinguish the decision in the Gobitis case, instead of relying upon it as supporting authority. Under such circumstances and believing, as we do, that the flag salute here required is violative of religious liberty when required of persons holding the religious views of plaintiffs, we feel that we would be recreant to our duty as judges, if through a blind following of a decision which the Supreme Court itself has thus impaired as an authority, we should deny protection to rights which we regard as among the most sacred of those protected by constitutional guaranties."

[2] Hart v. B. F. Keith Vaudeville Exchange, 2 Cir., 12 F.2d 341, 47 A.L.R. 775.

[3] 8 U.S.C.A. § 56 and 18 U.S.C.A. § 1581; see United States v. Reynolds, 235 U.S. 133, 35 S.Ct. 86, 59 L.Ed. 162; Bailey v. Alabama, 219 U.S. 219, 31 S. Ct. 145, 55 L.Ed. 191; Clyatt v. United States, 197 U.S. 207, 25 S.Ct. 429, 49 L. Ed. 726; Taylor v. State of Georgia, 315 U.S. 25, 62 S.Ct. 415, 86 L.Ed. 615; Pollock v. Williams, 322 U.S. 4, 62 S.Ct. 415 86 L.Ed. 615.

club other than the club which originally employs him or its assignee. Although many courts have refused to enforce the "reserve" clause,[4] yet severe and practically efficacious extra-legal penalties are imposed for violation. The most extreme of these penalties is the blacklisting of the player so that no club in organized baseball will hire him. In effect, this clause prevents a player from ever playing with any team other than his original employer, unless that employer consents. Since the right to play with organized baseball is indispensable to the career of a professional baseball player, violations of the clause by such players are infrequent. The violator may perhaps become a judge (with a less exciting and often less remunerative occupation) or a bartender or a street-sweeper, but his chances of ever again playing baseball are exceedingly slim.

As one court, perhaps a bit exaggeratedly, has put it,[5] "While the services of these baseball players are ostensibly secured by voluntary contracts a study of the system as * * * practiced under the plan of the National Agreement, reveals the involuntary character of the servitude which is imposed upon players by the strength of the combination controlling the labor of practically all of the players in the country. * * * There is no difference in principle between the system of servitude built up by the operation of this National Agreement, which * * * provides for the purchase, sale barter, and exchange of the services of baseball players—skilled laborers—without their consent, and the system of peonage brought into the United States from Mexico and thereafter existing for a time within the territory of New Mexico. * * * The system created by 'organized baseball' in recent years presents the question of the establishment of a scheme by which the personal freedom, the right to contract for their labor wherever they will, of 10,000 skilled laborers, is placed under the dominion of a benevolent despotism through the operation of the monopoly established by the National Agreement." I may add that, if the players be regarded as quasi-peons, it is of no moment that they are well paid; only the totalitarian-minded will believe that high pay excuses virtual slavery.

In what I have said about the nature of the contracts made with the players, I am not to be understood as implying that they violate the Thirteenth Amendment or the statutes enacted pursuant thereto. I mean simply to suggest that those contracts are so opposed to the public policy of the United States [5a] that, if possible, they should be deemed within the prohibitions of the Sherman Act 15 U.S. C.A. §§ 1–7, 15 note.

2. On a motion to dismiss, the complaint must be liberally construed in plaintiff's favor. So construing this complaint, I think that the facts of the instant case significantly differ from those in the Federal Baseball case, because here the defendants have lucratively contracted for the interstate communication, by radio and television, of the playings of the games.[5b] In that earlier case, the Court held that the traveling across state lines was but an incidental means of enabling games to be played locally—i.e., within particular states—and therefore insufficient to constitute interstate commerce.[5c] Here,

---

4 Allegheny Baseball Club v. Bennett, C.C.W.D.Pa., 14 F. 257; Metropolitan Exhibition Co. v. Ewing, C.C.S.D.N.Y., 42 F. 198, 7 L.R.A. 381; Brooklyn Baseball Club v. McGuire, C.C.E.D.Pa., 116 F. 782; Weegham v. Killefer, 6 Cir., 215 F. 289, L.R.A.1915A, 820; American League Baseball Club v. Chase, 86 Misc. 441, 149 N.Y.S. 6; Cincinnati Exhibition Co. v. Johnson, 190 Ill.App. 630; Metropolitan Exhibition Co. v. Ward, 9 N. Y.S. 779.

5 American League Baseball Club v. Chase, 86 Misc. 441, 465, 466, 149 N.Y.S. 6, 19.

5a Cf. Hurd v. Hodge, 334 U.S. 24, 34, 68 S.Ct. 847.

5b That the defendants' radio contracts are lucrative, see, Pittsburgh Athletic Co. v. KQV Broadcasting Co., D.C., 24 F.Supp. 490; Mutual Broadcasting System, Inc. v. Muzak Corp., 177 Misc. 489, 30 N.Y.S.2d 419.

5c In passing, I note that that ruling is difficult to reconcile with the Mann Act cases; Caminetti v. United States, 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442, L.R.A.1917F, 502, Ann.Cas.1917B, 1168; Mortensen v. United States, 322 U.S. 369, 375, 64 S.Ct. 1037, 88 L.Ed. 1331;

although the playing of the games is essential to both defendants' intra-state and interstate activities, the interstate communication by radio and television is in no way a means, incidental or otherwise, of performing the intra-state activities (the local playings of the games).

True, in the Federal Baseball Club case, there was present in the record the fact that the defendants had sold the exclusive right to send "play-by-play" descriptions of the games over interstate telegraph wires. But the brief of the plaintiff filed in the Supreme Court in that case did not contend that that interstate communication was interstate commerce; it merely called attention to the telegraph service as one of several factors tending to show the popularity and national character of "organized Baseball." Moreover, the Supreme Court in its opinion in that case did not note the fact concerning the telegraph service; and it has often been held that a decision is not to be regarded as a precedent concerning a question clearly not considered by the Court, because "to make it so, there must have been an application of the judicial mind to the precise question, * * *".5d

Accordingly, as the Court in the Federal Baseball case, in deciding that interstate features were absent, discussed nothing but the traveling of the teams and their paraphernalia between states, as a means to the local playing of the games, I think that decision, as above indicated, should be deemed to hold no more than that such traveling does not give rise to interstate commerce for Sherman Act purposes. That such was the ruling appears from the way in which the Supreme Court there dealt with the facts: "A summary statement of the nature of the business involved will be enough to present the point. The clubs composing the Leagues are in different cities and for the most part in different States. The end of the elaborate organizations and sub-organizations that are described in the pleadings and evidence is that these clubs shall play against one another in public exhibitions for money, one or the other club crossing a state line in order to make the meeting possible. When as the result of these contests one club has won the pennant of its League and another club has won the pennant of the other League, there is a final competition for the World's championship between these two. Of course the scheme requires constantly repeated traveling on the part of the clubs, which is provided for, controlled and disciplined by the organizations, and this it is said means commerce among the States. But we are of opinion that the Court of Appeals was right. The business is giving exhibitions of baseball, which are purely state affairs. It is true that in order to attain for these exhibitions the great popularity that they have achieved, competitions must be arranged between clubs from different cities and States. But the fact that in order to give the exhibitions the Leagues must induce free persons to cross state lines and must arrange and pay for their doing so is not enough to change the character of the business. According to the distinction insisted upon in Hooper v. [People of State of] California, 155 U.S. 648, 655, 15 S.Ct. 207, 39 L.Ed. 297, the transport is a mere incident, not the essential thing."

I think the foregoing will serve alone to distinguish the incidental-means rationale of the Federal Baseball case: There the traveling was but a means to the end of playing games which themselves took place intra-state; here the games themselves, because of the radio and television, are, so to speak, played interstate as well as intra-state.

---

City of Cleveland v. United States, 329 U.S. 14, 19, 20, 67 S.Ct. 13, 91 L.Ed. 12.

5d St. Louis V. & T. H. R. v. Terre Haute R. Co., 145 U.S. 393, 403, 404, 12 S.Ct. 953, 956, 36 L.Ed. 748; Webster v. Fall, 266 U.S. 507, 511, 45 S.Ct. 148, 69 L.Ed. 411; KVOS, Inc. v. Associated Press, 299 U.S. 269, 279, 57 S.Ct. 197, 81 L.Ed. 183; Tefft, Weller & Co. v. Munsuri, 222 U.S. 114, 119, 120, 32 S.Ct. 67, 56 L.Ed. 118; United States v. Mitchell, 271 U.S. 9, 14, 46 S.Ct. 418, 70 L.Ed. 799; United States v. More, 3 Cranch 159, 172, 2 L.Ed. 397; The Edward, 1 Wheat. 261, 275, 276, 4 L.Ed. 86; Mutual Benefit Health & Accident Association v. Bowman, 8 Cir., 99 F.2d 856, 858; United States v. Dunbar, 9 Cir., 154 F.2d 889, 891.

There is, however, another important distinction on which I think we might rely, were another distinction necessary: In that earlier case, persons in other states received, via the telegraph, mere accounts of the games as told by others, while here we have the very substantially different fact of instant and direct interstate transmission, via television, of the games as they are being played, so that audiences in other states have the experience of being virtually present at these games. That degree of difference, known to any one who has ever sat at the receiving end of a television set, is so great as to constitute a difference in kind. To be sure, no one can draw a sharp line between differences of "degree" and "kind." However, to the question whether the difference between a difference of kind and difference of degree is itself a difference of degree or of kind, the sage answer has been given that it is a difference of degree, but a "violent" one.[6] "Courts of justice," said an English judge some sixty years ago, "ought not to be puzzled by such old scholastic questions as to where a horse's tail begins and where it ceases. You are obliged to say, 'This is a horse's tail,' at some time."[7]

In the Federal Baseball case, the Court assigned as a further ground of its decision that the playing of the games, although for profit, involved services, and that services were not "trade or commerce" as those words were used in the Sherman Act. But I think that such a restricted interpretation of those words has been undeniably repudiated in later Supreme Court decisions concerning medical services[7a] and motion pictures.[7b] I believe, therefore, that we will not trespass on the Supreme Court's domain if we hold that the rationale of the Federal Baseball case is now confined to the insufficiency of traveling, when employed as a means of accomplishing local activities, to establish the existence of interstate commerce.[7c]

I conclude, then, that here there is substantial interstate commerce of a sort not considered by the Court in the Federal Baseball case. These questions remain: (a) May Congress constitutionally regulate the interstate portion of such a business as that done by defendants? (b) If so, has Congress in the Sherman Act sufficiently exercised its constitutional power to include that portion of that business? I shall consider those questions in turn.

3. Supreme Court decisions relative to the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq., leave little doubt that the Constitutional power of Congress, under the commerce clause, extends to such a situation. In Roland Elec. Co. v. Walling,

---

[6] Williams, Language and The Law, 61 Law.Q.Rev. (1945) 179, 184.

[7] Chitty, J., in Lavery v. Pursell (1888) 39 Ch.D. at 517.

Holmes, J., often discussed this matter of line-drawing. Holmes, The Common Law (1881) 68, 110, 127; Holmes, Law in Science—Science in Law, 12 Harv. L.Rev. (1899) 443, reprinted in Holmes, Collected Legal Papers (1920) 210, 232–233; Hudson County Water Co. v. McCarter, 209 U.S. 349, 355, 28 S.Ct. 529, 52 L.Ed. 828, 14 Ann.Cas. 560; Irwin v. Gavit, 268 U.S. 161, 168, 45 S.Ct. 475, 69 L.Ed. 897; Superior Oil Co. v. State of Mississippi, 280 U.S. 390, 50 S.Ct. 169, 74 L.Ed. 504; Empire Trust Co. v. Cahan, 274 U.S. 473, 478, 47 S.Ct. 661, 71 L.Ed. 1158, 57 A.L.R. 921; Haddock v. Haddock, 201 U.S. 562, 631, 732, 26 S.Ct. 525, 50 L.Ed. 867, 5 Ann.Cas. 1; Schlesinger v. State of Wisconsin, 279 U.S. 230, 241, 46 S.Ct. 260, 70 L.Ed. 557, 43 A.L.R. 1224; Louisville Gas & Elec. Co. v. Coleman, 277 U.S. 32, 41, 48 S.Ct. 423, 72 L.Ed. 770; Quaker City Cab Co. v. Commonwealth of Pennsylvania, 277 U.S. 389, 403, 48 S.Ct. 553, 72 L.Ed. 927; Nash v. United States, 229 U.S. 373, 376, 33 S.Ct. 780, 57 L.Ed. 1232; Bullen v. State of Wisconsin, 240 U.S. 625, 630, 631, 36 S.Ct. 473, 60 L.Ed. 830.

[7a] American Medical Association v. United States, 317 U.S. 519, 63 S.Ct. 326, 87 L.Ed. 434; cf. the reference to that case in United States v. Southeastern Underwriters Association, 322 U.S. 533, 546 and note 25, 64 S.Ct. 1162, 88 L.Ed. 1440.

[7b] Binderup v. Pathe Exchange, Inc., 263 U.S. 291, 44 S.Ct. 96, 68 L.Ed. 308; Paramount Famous Lasky Corp. v. United States, 282 U.S. 30, 51 S.Ct. 42, 75 L.Ed. 145; United States v. First Natl. Pictures, 282 U.S. 44, 51 S.Ct. 45, 75 L.Ed. 151; Interstate Circuit, Inc. v. United States, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610; Bigelow v. R. K. O. Radio Pictures, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652.

[7c] Cf. North American Co. v. S. E. C., 327 U.S. 686, 694, 66 S.Ct. 785, 90 L.Ed. 945.

326 U.S. 657, 66 S.Ct. 413, 416, 90 L.Ed. 383, an action to enjoin an alleged violation of that Act, the defendant was engaged in commercial and industrial wiring, electrical contracting, and dealing in electrical motors and generators. One of its customers was admittedly engaged in interstate telephony, others in the repair of ships intended for movement in interstate commerce, or in the production of goods for commerce. This the Court said (in an opinion by Justice Burton) brought the defendant within the Act, which "does not require the employee to be directly 'engaged in commerce'" or even "employed * * * in the production of an article which itself becomes the subject of commerce * * .*. It is enough that the employee be employed, for example, in an occupation which is necessary to the production of a part of any other 'articles or subjects of commerce of any character' which are produced for trade, commerce or transportation among the several states." Roland Elec. Co. v. Walling was followed in Martino v. Michigan Window Cleaning Co., 327 U.S. 173, 66 S.Ct. 379, 380, 90 L.Ed. 603, where the employer was an independent contractor engaged in washing windows, painting and similar maintenance work entirely within the State of Michigan on premises used in the production of goods for commerce. This the Court said constituted "the production of goods for commerce", under the Fair Labor Standards Act. Several Circuit courts, including this court, have in like manner widely interpreted Congress' constitutional power under the commerce clause. See N.L.R.B. v. Cleveland Cliffs Iron Co., 6 Cir., 133 F.2d 295; Culver v. Bell & Loffland, 9 Cir., 146 F.2d 29; Walling v. Connecticut Co., 2 Cir., 154 F.2d 552; Consumers Power Co. v. N.L.R.B., 6 Cir., 113 F.2d 38; N.L.R.B. v. Gulf Public Service Co., 5 Cir., 116 F.2d 852.

Nor is Congressional exercise of the commerce power barred with respect to a particular business enterprise because its activities in or affecting interstate commerce constitute but a small percentage of its total activities. Thus in Mabee v. White Plains Pub. Co., 327 U.S. 178, 66 S.Ct. 511, 90 L.Ed. 607, the Court held within the Fair Labor Standards Act a publisher of a daily newspaper only ½ of 1% of whose circulation (about 45 daily copies of the paper out of a total of 10,000) was regularly out-of-state. So here: The complaint, liberally construed, imports that the radio and television contracts yield defendants a substantial, not a trifling, sum. On that basis, I think the defendants and the ballplayers are engaged in interstate commerce, regardless of whether or not that sum is but a small percentage of defendants' total earnings.

It seems to me, therefore, that Congress had the Constitutional power to include defendants' interstate business in the Sherman Act. I turn now to the question whether Congress there exercised that power.

4. The Supreme Court has said that (with an exception as to labor unions not relevant here) Congress in the Sherman Act intended to use all the constitutional power conferred on it by the commerce clause. The Court (per Sutherland, J.) so stated for the first time in Atlantic Cleaners & Dyers, Inc. v. United States, 286 U.S. 427, 435, 52 S.Ct. 607, 76 L.Ed. 1204. The Court, per Stone, J., repeated that statement in Apex Hosiery Co. v. Leader, 310 U.S. 469, 496, adding, at page 498, 60 S. Ct. 982, 995, 84 L.Ed. 1311, 128 A.L.R. 1044, that the Sherman Act is aimed at restraints "comparable to restraints deemed illegal at common law, although accomplished by means other than contract and which, for constitutional reasons, are confined to transactions in or which affect interstate commerce." This idea was repeated in United States v. Frankfort Distilleries, 324 U.S. 293, 294, 297, 65 S.Ct. 661, 664, 89 L. Ed. 951: "And with reference to commercial trade restraints such as these, Congress, in passing the Sherman Act, left no area of its constitutional power unoccupied; it 'exercised "all the power it possessed." ' "

The most striking statement, however, is in the Southeastern case, 322 U.S. 533, 64 S.Ct. 1162, 1176, 88 L.Ed. 1440, where the argument was pressed that although the Constitutional commerce power empowered it to do so, Congress in the Sherman Act did not intend to cover insurance. The Court found that "all the acceptable

evidence points the other way. That Congress wanted to go to the utmost extent of its Constitutional power in restraining trust and monopoly agreements such as the indictment here charges admits of little, if any, doubt. The purpose was to use that power to make of ours, so far as Congress could under our dual system, a competitive business economy."

The comprehensive sweep of the Sherman Act is also shown by the Supreme Court's reliance, in several Sherman Act cases, upon cases construing the National Labor Relations Act and other statutes. For instance, in the Associated Press case, Associated Press v. United States, 326 U.S. 1, 14, 65 S.Ct. 1416, 1421, 89 L.Ed. 2013, the Court disposed, in one sentence, of the argument that that enterprise was not subject to the Sherman Act: "We need not again pass upon the contention that trade in news carried on among the states is not interstate commerce, Associated Press v. Labor Board, 301 U.S. 103, 57 S.Ct. 650, 81 L.Ed. 953". Justice Frankfurter, concurring, agreed, saying, 326 U.S. at page 27, 65 S.Ct. at page 1428, 89 L.Ed. 2013: "Since the Associated Press is an enterprise engaged in interstate commerce, Associated Press v. Labor Board, supra, these plainly are agreements in restraint of that commerce."

In the more recent case of Mandeville Island Farms v. American Crystal Sugar Co., 334 U.S. 219, 236, 68 S.Ct. 996, the Court discussed the scope of the Sherman Act and of the Constitutional commerce power as if they were identical, citing United States v. Darby, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430, a Fair Labor Standards Act case, Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126, a National Labor Relations Act case, and United States v. Walsh, 331 U.S. 432, 67 S.Ct. 1283, 91 L.Ed. 1585, a Food and Drug Act case. Moreover, the discussion in the Mandeville opinion of the effect of the Shreveport Rate Cases, 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341, goes to show that, as the Court has come to construe the commerce clause more widely in connection with the coverage of other statutes, such as the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq., it has equivalently interpreted the Sherman Act's coverage.[8] And certainly the Mandeville opinion demonstrates that the Sherman Act covers activities wholly within a state but which affect interstate commerce.

5. In the light of my previous discussion, and having particularly in mind Mabee v. White Plains Pub. Co., 327 U.S. 178, 66 S.Ct. 511, 90 L.Ed. 607, I think we must, for purposes of deciding the applicability of the Sherman Act, consider this case as if the only audiences for whom the games are played consist of those persons who, in other states, see, hear, or hear about, the games via television and radio. The question here is, then, I think, the same as that which we would face if a similar alleged monopoly related to the production of stage-plays in radio and television studios. I believe the producers of such plays would clearly come within the Fair Labor Stand-

---

8 The Mandeville opinion explains that, in United States v. E. C. Knight Co., 156 U.S. 1, 15 S.Ct. 249, 39 L.Ed. 325; the Court had decided that manufacturing was not commerce; the Sherman Act thereby became a "dead letter," and was not finally reborn until 1911 "with the decisions in Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L. Ed. 619, 34 L.R.A.,N.S., 834, Ann.Cas. 1912D, 734, and United States v. American Tobacco Co., 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663", 334 U.S. 219, 68 S. Ct. 1003; it was the doctrine of the Shreveport Rate Cases, 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341, (i.e., that activities within a state may be federally regulated if they affect interstate commerce) as extended by later decisions, which made it no longer necessary "to search for some sharp point or line where interstate commerce ends and intrastate commerce begins * * *." As late as the 1930's (the Court continued in the Mandeville opinion) the old ideas persisted in specific applications, but a growing number of decisions had rejected the idea that manufacturing was purely local simply because that phase of a combination restraining trade was carried on within a single state. It "is the effect upon that commerce, not the moment when its cause arises, which the doctrine [of the Shreveport cases] was fashioned to reach."

ards Acts.[3a] If so, they would be within the Sherman Act. And I would so hold concerning the defendants, if their conduct is as plaintiff describes it.

As the playing of the games is essential both to defendants' interstate and intrastate activities, the players' contracts relate to both. But that, as a consequence, necessary relief with respect to the interstate activities will thus unavoidably affect those which are intrastate does not preclude the granting of such relief.[9] Nor, I venture to repeat, do I think such relief is dependent upon a showing that the illegally monopolized interstate activities, if more than trifling, represent a substantial proportion of defendants' total activities.[9a] See Mabee v. White Plains Pub Co., 327 U.S. 178, 66 S.Ct. 511, 90 L.Ed. 607; cf. Apex Hosiery Co. v. Leader, 310 U.S. 469, 485, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044; United States v. Yellow Cab Co., 332 U.S. 218, 225, 67 S.Ct. 1560, 91 L.Ed. 2010.

In United States v. Socony Vacuum Oil Co., 310 U.S. 150, 224 note 59, 60 S.Ct. 811, 845, 84 L.Ed. 1129, the Court said that "the amount of interstate * * * trade involved is not material", citing with approval Montague & Co. v. Lowry, 193 U.S. 38, 24 S.Ct. 307, 48 L.Ed. 608; Steers v. United States, 6 Cir., 192 F. 1, 5; Patterson v. United States, 6 Cir., 222 F. 599, 618, 619. I consider adequate the allegations concerning damages.[10]

6. Defendants suggest that "organized baseball," which supplies millions of Americans with desirable diversion, will be unable to exist without the "reserve clause." Whether that is true, no court can predict. In any event, the answer is that the public's pleasure does not authorize the courts to condone illegality, and that no court should strive ingeniously to legalize a private (even if benevolent) dictatorship.

I think we should reverse and remand.

---

[3a] Cf., as to the National Labor Relations Act, Marcus Loew Booking Agency, Inc., 3 N.L.R.B. 380; Los Angeles Broadcasting Co., 4 N.L.R.B. 443; KMOX Broadcasting Station, 10 N.L.R.B. 479; Louis G. Baltimore, 57 N.L.R.B. 1611; Miami Valley Broadcasting Corp., 70 N.L.R.B. 1015.

In Fisher's Blend Station v. Tax Commission, 297 U.S. 650, 655, 56 S.Ct. 608, 610, 80 L.Ed. 956, the Court said: "By its very nature broadcasting transcends state lines and is national in its scope and importance—characteristics which bring it within the purpose and protection, and subject it to the control, of the commerce clause."

[9] Minnesota Rate Cases, 230 U.S. 352, 399, 33 S.Ct. 729, 57 L.Ed. 1511, 48 L.R.A.,N.S., 1151, Ann.Cas.1916A, 18; Shreveport Rate Cases, 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341; United States v. New York Central R. Co., 272 U.S. 457, 47 S.Ct. 130, 71 L.Ed. 350; Currin v. Wallace, 306 U.S. 1, 59 S.Ct. 379, 83 L.Ed. 441; Mandeville Farms v. American Crystal Sugar Co., 334 U.S. 219, 236, 68 S.Ct. 996; United States v. Wright-

wood Dairy Co., 315 U.S. 110, 119, 62 S.Ct. 523, 86 L.Ed. 726; Santa Cruz Fruit Packing Co. v. Labor Board, 303 U.S. 453, 466, 58 S.Ct. 656, 82 L.Ed. 954; United States v. Darby, 312 U.S. 100, 118–123, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430; Wickard v. Filburn, 317 U.S. 111, 122–124, 63 S.Ct. 82, 87 L.Ed. 122.

[9a] If proportions were important, the following would be pertinent: Presumably with little increased expense to the defendants, earnings from the radio and television contracts are something added to what defendants theretofore earned net, so that these added earnings are "velvet" which therefore may (in the Sherman Act context) be regarded as contributing entirely, or almost entirely, to defendants' net profits. Accordingly, in determining proportions, the radio and television net profits should be compared with defendants' other net, not their gross, profits.

[10] Package Closure Corp. v. Sealright, 2 Cir., 141 F.2d 972; Bigelow v. RKO Pictures, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652.