Curtis C. FLOOD, Plaintiff,

v.

Bowie K. KUHN, Individually and as Commissioner of Baseball, et al., Defendants.

No. 70 Civ. 202.

United States District Court,
S. D. New York.

March 4, 1970.

Zerman, Clayton, Mo., for plaintiff; Arthur J. Goldberg, Jay H. Topkis, Richard M. Moss, Daniel Levitt, Max Gitter, William D. Iverson, New York City, of counsel.

Donovan, Leisure, Newton & Irvine, New York City, Arnold & Porter, Washington, D. C., for defendant Bowie K. Kuhn; Paul A. Porter, William L. McGovern, Dennis G. Lyons, Douglas G. Robinson, Washington, D. C., George S. Leisure, Jr., John E. Tobin, New York City, of counsel.

Willkie, Farr & Gallagher, New York City, for defendants; Louis F. Carroll, Mark F. Hughes, Louis L. Hoynes, Jr., Barry Rona, Robert J. Kheel, New York City, of counsel.

Baker, Hostetler & Patterson, Cleveland, Ohio, for defendant Joseph E. Cronin, President of the American League of Professional Baseball Clubs, and all American League Clubs; Alexander H. Hadden, James P. Garner, Sargent Karch, Cleveland, Ohio, of counsel.

COOPER, District Judge.

This is an action brought by plaintiff Curtis C. Flood, a major league professional baseball player, to enjoin [1] the defendants—several major league baseball clubs, the American and National Leagues of Professional Baseball Clubs, the Commissioner of Baseball, and certain named individuals—from enforcing organized baseball's reserve system against him.[2] Plaintiff now moves for a preliminary injunction enjoining during the pendency of this action each baseball club defendant from refusing to offer employment to him as a baseball player, pursuant to an arrangement among the clubs which constitutes the reserve system, and each individual defendant from taking any action in furtherance of such arrangement.[3]

Paul, Weiss, Goldberg, Rifkind, Wharton & Garrison, New York City, Allan H.

1. Plaintiff also seeks certain treble damages both in addition to injunctive relief and in the alternative if equitable relief is denied.

2. A Fifth Cause of Action seeks to enjoin certain other alleged practices of two of the defendant ball clubs which are not relevant to plaintiff's present motion.

3. Plaintiff has agreed to be confined in this application for a preliminary injunction to the facts that are admitted on both sides and not in controversy. He

The application now before us presents a pure question of law. Accordingly, our duty prohibits either the exercise of unrestricted discretionary power or an expression of personal preference. Regardless of our determination of the present application, the merits of the suit itself have yet to be resolved at a full trial.

In October, 1969 the contracts of plaintiff and several other ballplayers for the St. Louis National Baseball Club were assigned to the Philadelphia National League Club in exchange for the contracts of certain players for the Philadelphia Club. Plaintiff objects to this "trade" and refuses to join the Philadelphia Club, claiming as unlawful the reserve system.

Essentially plaintiff's attack is directed against the reserve system which has been in effect for nearly one hundred years and which he charges is unlawful in a number of respects under four separate causes of action. Each seeks a declaration of the illegality of this reserve system and an injunction restraining its operation as to him. First is a federal claim that this constitutes an unreasonable restraint of trade in violation of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2. His second and third are state law claims for violations of the antitrust laws and common law respectively where jurisdiction is based on diversity of citizenship. His fourth cause of action alleges that this system subjects him to a condition of involuntary servitude in violation of the Thirteenth Amendment and certain federal civil rights and labor statutes, 18 U.S.C. § 1581, 42 U.S.C. § 1994, and 29 U.S.C. §§ 102 and 103.

### The Reserve System

The reserve system (also known as the "reserve clause") is the heart of plaintiff's complaint. No player seeking to play baseball professionally in this country can avoid its strictures since it applies to all clubs in both the major and minor leagues and thus all of organized baseball. The effect of this system is to restrict a player throughout his baseball life to negotiate with only one club at any one time; that club being either the one with which he begins his career or the club to which his contract is assigned.

In general, the reserve system operates by the enforcement of the following baseball rules and contract terms. Rule 3 of the Major League Rules and Professional Baseball Rules [4] agreed to by all professional baseball clubs requires that each club contract with its players only pursuant to the Uniform Players Contract and specifically that "no club shall make a contract * * * containing a non-reserve clause." The Uniform Player's Contract provides in part that if in the year of expiration of the contract a player and a club do not reach agreement on a new contract by a certain date, the club may unilaterally renew the existing contract subject to certain salary controls. Such renewal contract would itself contain this renewal clause. The club with which a ballplayer initially signs thus has a right to his services for as long as it wishes to renew his contract, subject only to his right to retire from baseball.

Another section of this same Uniform Contract provides that a player's contract may be assigned, without his approval, to any other major league club in accordance with the baseball rules.

To insure respect for these contract rights once obtained by a club, Rule 4–A of the Major League and Professional Baseball Rules provides that each club may place its players on a reserve list, including any of its players who voluntarily retire or who fail to report to or

does not seek an evidentiary hearing to resolve such facts as may be in dispute. Transcript of Argument, February 3, 1970, p. 4.
This opinion constitutes this Court's findings of fact and conclusions of law necessary to our determination in accordance with Rule 52(a), F.R.Civ.P.

4. Applicable to minor league clubs.

contract with the club, "and thereafter no player on any list shall be eligible to play for or negotiate with any other club until his contract has been assigned or he has been released."[5] Additionally, Rule 3(g) of the Major League and Professional Baseball Rules binding on all clubs prohibits any "tampering" with the players for any club by any other club.[6]

### Introduction

Baseball has been the national pastime for over one hundred years and enjoys a unique place in our American heritage. Major league professional baseball is avidly followed by millions of fans, looked upon with fervor and pride and provides a special source of inspiration and competitive team spirit especially for the young.

Baseball's status in the life of the nation is so pervasive that it would not strain credulity to say the Court can take judicial notice that baseball is everybody's business. To put it mildly and with restraint, it would be unfortunate indeed if a fine sport and profession, which brings surcease from daily travail and an escape from the ordinary to most inhabitants of this land, were to suffer in the least because of undue concentration by any one or any group on commercial and profit considerations. The game is on higher ground; it behooves every one to keep it there.

From what the papers before us reflect, we are certain that plaintiff and defendants each believe they have the best interests of the game at heart. In general, defendants contend that the reserve system is essential to prevent a relapse into the instability of those early years of professional baseball when play-ers were free to change teams. Plaintiff, and apparently the Major League Baseball Players Association too, concede the need for some form of reserve on players, but argue that these objectives can be met by a less restrictive system.

The grip may well be far too tight and it may be best to loosen the bonds without permitting the slightest sag to the body of the game. However, courts do not sit as arbitrators. We have no power to devise and enforce alternatives to the present reserve system that may accommodate the interest of both parties.

The sole question before us is whether plaintiff has made the necessary showing to entitle him to a preliminary injunction restraining the operation of the reserve system and making plaintiff a free agent pending a final resolution upon a trial of the substantial issues of fact and law presented by this lawsuit. Under recognized principles, applicable to motions for preliminary injunctive relief, the Court is constrained to deny the motion. This however is the first inning. We are simply deciding that at this initial stage of the lawsuit, plaintiff is not entitled to the substance of the ultimate relief he seeks.

### I

### Standard for Issuance of a Preliminary Injunction

The general purpose of a preliminary injunction is to maintain and preserve the status quo until the case can be ultimately resolved on the merits.[7] It is an extraordinary remedy, to be issued only reluctantly and where the right to the relief is clear.[8] "A clear

5. See also Rule 15 of the Major League and Professional Baseball Rules.

6. Rule 3(g) provides: "[t]o preserve discipline and competition, and to prevent the enticement of players * * * there shall be no negotiations or dealings respecting employment, either present or prospective, between any player * * * and any club other than the club with which he is under contract or acceptance of terms, or by which he is reserved, or

which has the player on its Negotiation List. * * *"

7. Unicon Management Corp. v. Koppers Co., 366 F.2d 199, 204 (2d Cir. 1966).

8. Checker Motors Corp. v. Chrysler Corp., 405 F.2d 319 (2d Cir. 1969); 601 West 26 Corp. v. Solitron Devices, Inc., 291 F.Supp. 882 (S.D.N.Y.1968); Blaich v. National Football League, 212 F.Supp. 319, 320 (S.D.N.Y.1962).

showing of probable success *and* possible irreparable injury" is necessary.[9]

■ Where there is a "lack of adequate showing of irreparable damage" the party seeking a preliminary injunction must convince the court with reasonable certainty that it will ultimately succeed.[10] However, where the "balance of hardships tips decidedly toward the party requesting the temporary relief," the burden of showing probable success lessens to a requirement that he raise "questions going to the merits so serious, substantial, and difficult as to make them a fair ground for litigation and thus for more deliberate investigation."[11] The likelihood of success is "merely one strong factor to be weighed along with the comparative injuries of the parties."[12]

■ With regard to plaintiff's burden on the balance of hardships, the need to show irreparable injury is especially present where "the effect of [a preliminary] injunction is prematurely to give the party seeking it a substantial part of the relief sought in the final judgment."[13]

## A. Status Quo

■ The status quo has been frequently defined as the last uncontested status which preceded the pending controversy.[14] A preliminary injunction should serve "to keep the parties, while the suit goes on, as far as possible in the respective positions they occupied when the suit began."[15]

■ The preliminary relief plaintiff seeks is to prohibit defendants from collectively refusing to negotiate with him; in effect, a declaration that he is a "free agent." He has never enjoyed that status in the past and issuance of such a preliminary injunction would grant him the ultimate relief he seeks prior to a determination of the merits and make it difficult to restore the parties to their prior status (plaintiff's contract assigned to Philadelphia) should plaintiff fail to sustain his claims. Moreover, we doubt that the abolition of all restraints imposed by the reserve system (including both the right of a club to retain its players and, as a consequence, the right to trade players) could be limited to plaintiff alone should other similarly situated ballplayers seek a similar injunction.

Enjoining defendants from refusing to negotiate with plaintiff "[m]ost assuredly * * * would not be preserving any semblance of the situation as it existed just prior to the commencement of the present litigation."[16]

Relief short of declaring plaintiff a free agent must be considered. Less drastic relief might be to rescind plaintiff's assignment to the Philadelphia Club and prohibit St. Louis from further assigning plaintiff's contract dur-

9. Checker Motors Corp. v. Chrysler Corp., *supra*; Societe Comptoir De L'Indus. Cotonniere Etablissements Boussac v. Alexander's Dept. Stores Inc., 299 F.2d 33, 35, 1 A.L.R.3d 752 (2d Cir. 1962); Clairol Inc. v. Gillette Co., 389 F.2d 264, 265 (2d Cir. 1968).

10. H. E. Fletcher Co. v. Rock of Ages Corp., 326 F.2d 13, 17 (2d Cir. 1963); Unicon Management Corp. v. Koppers Co., *supra*.

11. Checker Motors Corp. v. Chrysler Corp., *supra*; Unicon Management Corp. v. Koppers Co., *supra* 366 F.2d at 204–205; Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 740 (2d Cir. 1953).

12. Unicon Management Corp. v. Koppers Co., *supra* 366 F.2d at 205.

13. Foundry Services v. Beneflux Corp., 206 F.2d 214, 216 (2d Cir. 1953); Anderson-Friberg Inc. v. Justin R. Clary & Son, 98 F.Supp. 75, 82 (S.D.N.Y.1951); Hambros Bank Ltd. v. Meserole, 287 F. Supp. 69, 71 (S.D.N.Y.1968).

14. See Warner Bros. Pictures v. Gittone, 110 F.2d 292, 293 (3rd Cir. 1940). Cf. Unicon Management Corp. v. Koppers Co., *supra* 366 F.2d at 204.

15. Hamilton Watch Co. v. Benrus Watch Co., *supra* 206 F.2d at 742.

16. Washington Capitols Basketball Club, Inc. v. Barry, 304 F.Supp. 1193, 1196–1197 (N.D.Cal.1969).

ing the pendency of this suit. In his reply to defendant's papers in opposition plaintiff in fact suggests that St. Louis represents the status quo. Rather than wholly suspending the operation of the reserve system its effect would be confined to suspending the operation of the assignment provisions. We believe that such an alternative may offer plaintiff greater hope for success at this preliminary stage.

As we see it, the last actual non-contested status of the parties prior to this dispute saw plaintiff under a contract to the St. Louis Club, but one which was by its terms assignable. The present status of plaintiff's contract assigned to the Philadelphia Club by the St. Louis Club is therefore consistent with the status quo.[17] Were we to rescind plaintiff's assignment to the Philadelphia Club, restore plaintiff's prior contractual position with the St. Louis Club, and prohibit St. Louis from further assigning plaintiff's contract, we would fundamentally alter the prior status of the parties. The St. Louis Club would only have the option of renewing plaintiff's contract or terminating his employment (which would make plaintiff a free agent). In our view then, interference at this point with the assignability of plaintiff's contract does not preserve the status quo; it accords plaintiff a new status.

Furthermore, we perceive no tenable distinction between plaintiff and any other ballplayer whose contract for the coming season may have been or may yet be assigned to another club and who might desire similar relief.[18] Granting plaintiff relief pending the outcome of this suit might well effect a moratorium on all trading among baseball clubs. Such potential for disruption of long-standing practices of organized baseball cannot be fairly termed preservation of the status quo.[19]

■ Preliminary relief to plaintiff would not serve to preserve the status quo. Nevertheless, without regard to preserving the status quo, preliminary relief may be ordered if there is a sufficient showing of potential irreparable harm to the plaintiff.[20] Such instances are rare, however, and the burden on plaintiff is very demanding.

### B. *Balance of Hardships*

### 1. Irreparable Harm to Plaintiff

■ Irreparable harm means irremediable injury that is certain and great.[21] If plaintiff is denied this preliminary relief he will indeed suffer serious consequences. He alleges that he will not play for the Philadelphia Club because it would uproot his long-established social and communal ties in St. Louis, remove him from the scene of three portrait studios he is operating in St. Louis, and most importantly destroy his personal dignity because he would feel that he had allowed himself to be "sold as a chattel." [22]

■ If he does not play baseball for Philadelphia, then by virtue of the operation of the reserve system he will be barred from professional baseball. Plaintiff's outstanding baseball talents will decline over the years; he is presently thirty-one years of age and at the prime of his career. Loss of any one of his remaining baseball years is irreparable, especially so since plaintiff avers that his skills may deteriorate more rapidly with disuse.

---

17. Compare Washington Capitols Basketball Club, Inc. v. Barry, *supra.*

18. Though it seems to us that this class would probably be more restricted in size than the players who, if plaintiff were granted "free agent" status, might be accorded similar relief.

19. See Carroll v. American Fed. of Musicians, 295 F.2d 484, 486 (2d Cir. 1961).

20. See Ross-Whitney Corp. v. Smith Kline & French Lab., 207 F.2d 190, 199 (9th Cir. 1953). Cf. Unicon Management Corp. v. Koppers Co., *supra*, 366 F.2d at 204.

21. Federal Maritime Com'n v. Atlantic & Gulf/Panama Canal Zone, 241 F.Supp. 766, 781 (S.D.N.Y.1965).

22. Affidavit of Curtis C. Flood, January 16, 1970, p. 3.

Plaintiff's argument is compelling, but contains a basic flaw. Plaintiff is not wholly excluded from baseball. He has been offered a contract by the Philadelphia Club for the 1970 season at the same $90,000 salary he earned at St. Louis. It is his *choice* not to play baseball. He has a duty to mitigate his damages. Accordingly, we must view his potential injuries not as those which may occur if he chooses not to play baseball, but as those which he will nonetheless suffer if he does play baseball.

These injuries which are set forth above as the reasons why plaintiff does not intend to play for Philadelphia are themselves substantial and to some extent irreparable. Thus plaintiff can never be adequately compensated by money damages for what appears to be a genuine feeling of loss of personal dignity if he continues to be employed under a system which affords him no freedom of choice as to his employer. What weight can a system of law give to this feeling which other ballplayers also operating under such strictures may or may not feel? Plaintiff is not being asked to surrender his right either to the maintenance of this lawsuit,[23] or, if he is found entitled, to his final relief.

Plaintiff will suffer undoubted loss of social and communal ties to St. Louis which he has developed during his twelve years as a ballplayer there. Additionally, his outside business interests in St. Louis may well suffer. These interests are both substantial, although the latter may be subject to monetary compensation and there appears no reason to expect that plaintiff could not develop similar social and business interests elsewhere.[24] In this regard, we observe that the relief ultimately sought by plaintiff would

not and could not compel the St. Louis Club to retain his services. He seeks to become a "free agent" which might or might not result in his remaining in St. Louis. Were he to contract to play for any club except St. Louis, these losses would be the same, he would suffer playing for Philadelphia.

### 2. Harm to Defendants

In weighing the equities, we must consider the potential harm to defendants and others if this injunction is granted pending a trial of the issues.

Two substantial potential injuries seem apparent. First, the trade of which plaintiff was a part, involved an exchange of four ballplayers for the St. Louis Club (including Plaintiff) for three for the Philadelphia Club. The other six players may already have acted in reliance upon this transfer (relocating themselves and their families, etc.). Were we to declare plaintiff a free agent or return him to St. Louis, the position of these players might be thrown into doubt. In this regard, though not so significant as the reliance interests of the players involved, the respective ball clubs in consummating this trade and in planning their player requirements have also relied upon their right to assign player contracts.[25]

Second, as we recognized in assessing the status quo there is danger that the grant of a preliminary injunction to plaintiff might result in similar relief being accorded other ballplayers who might seek it. At the very least there is a strong possibility that considerable litigation, with potential for interfering with the operation of the 1970 baseball season, might be precipitated by the granting of plaintiff's motion.

23. We fail to see and are not informed by plaintiff why or how his playing for the Philadelphia Club would, as he suggests, affect his right to maintain this lawsuit for injunctive relief. Playing pursuant to a contract executed under protest and for the sole purpose of mitigating damages would not appear to constitute a waiver or estoppel of any kind.

24. Compare, Washington Capitols Basketball Club v. Barry, *supra*, 304 F.Supp. at 1202.

25. Of course, this in no way implies that plaintiff has no right to retire.

### 3. Weighing the Equities

We do not believe that plaintiff has made a strong showing of irreparable injury and are unable to conclude that the balance of hardships tips decidedly in his favor.

### C. *Probability of Success at Trial*

Seeking relief which he would normally be entitled to only if he prevailed after a full trial and which would fundamentally alter the status quo, and failing to tip the scale of equities clearly in his favor, plaintiff must establish clear and unmistakable probable success on the merits before we can consider exercising our discretion to grant him a preliminary injunction.

### 1. The Federal Antitrust Claim

Plaintiff contends the reserve system is an unreasonable restraint of trade in violation of Sections 1 and 2 of the Sherman Act because the teams collectively agree to contract with players only on uniform terms and agree to divide the player market by giving each team exclusive rights to bargain with its players and because it is enforced by group boycott and concerted refusal to deal on the part of all professional teams against any player seeking to escape its restrictions.

#### a. Baseball's federal antitrust exemption

 Plaintiff's federal antitrust claim is appealing,[26] but in light of the consistent and clear holdings of the Supreme Court that baseball is not subject to the federal antitrust laws (no matter how illogical such holdings may appear to some by reason of subsequent events), the final outcome of this litigation is doubtful to say the least—indeed plaintiff has a formidable hurdle to leap to achieve ultimate success.

In 1922 in Federal Baseball Club of Baltimore v. National League,[27] the Supreme Court faced with an attack on the validity of the reserve system held that the business of professional baseball was not within the scope of the federal antitrust laws because the exhibitions were purely state affairs, were not trade or commerce in the ordinarily accepted use of the words, and the interstate transportation of players was merely in-

---

26. See, *e. g.*, Comment, "Monopsony in Manpower: Organized Baseball Meets the Antitrust Laws," 62 Yale L.J. 576, 622–624 (1953); Note, "The Super Bowl and the Sherman Act: Professional Sports and the Antitrust Laws," 81 Harv.L.Rev. 418, 420–426 (1967). Concerted refusals to deal have frequently been held *per se* violations of the Sherman Act. See United States v. General Motors Corp., 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); Radiant Burners, Inc. v. Peoples Gas Co., 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961); Klor's Inc. v. Broadway Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); Fashion Originators Guild v. FTC, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941); American Medical Ass'n v. United States, 76 U.S.App.D.C. 70, 130 F.2d 233, 248–249 (1942), aff'd, 317 U.S. 519, 63 S.Ct. 326, 87 L.Ed. 434 (1943). We are impressed by defendants' argument that the rule of reason should govern here, however, since it is generally conceded that some form of reserve system is es-

sential to the very maintenance of the "joint venture" of organized professional baseball. See Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963); Chicago Board of Trade v. United States, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918); Deesen v. Professional Golfers Ass'n, 358 F.2d 165 (9th Cir. 1966); Molinas v. National Basketball Ass'n, 190 F.Supp. 241 (S.D.N.Y.1961). Nevertheless, the baseball reserve rule appears excessively restrictive (far beyond that necessary to protect its aims of insuring stability of team membership, maximizing fan interest, and protecting club investments in player development). Less restrictive alternatives have been adopted in football, basketball and other professional sports. Accordingly, there appears a strong likelihood that the reserve system would be held an unreasonable restraint of trade.

27. 259 U.S. 200, 42 S.Ct. 465, 66 L.Ed. 898.

cidental. In 1949, the Second Circuit in reversing dismissal of the complaint in Gardella v. Chandler[28] held (per L. Hand, J.) that baseball may by then have become interstate commerce and subject to the antitrust laws, and (per Frank, J.) that the concept of commerce on which *Federal Baseball* was based had been wholly eroded by subsequent decisions.

When this question again reached the Supreme Court in 1953 in Toolson v. New York Yankees, Inc.,[29] the Court, without re-examining the underlying issue of interstate commerce, reaffirmed its prior decision in *Federal Baseball* "so far as [that decision] 'determines that Congress had no intention of including the business of baseball within the scope of the federal antitrust laws.'" The reasons assigned for that conclusion were that baseball had developed for thirty years in reliance on its "understanding that it was not subject to existing antitrust legislation;" that Congress had not seen fit to bring baseball under the antitrust laws "by legislation having prospective effect;" that the existing legislation should not be held applicable with "retrospective effect;" and that "if there are evils in this field which now warrant application to it of the antitrust laws it should be by legislation."

Subsequent decisions established that *Toolson* "was a narrow application of the rule of *stare decisis*" applicable only to baseball and to no other industry or professional sport.[30] Specifically, four years after *Toolson*, in Radovich v. National Football League,[31] the Supreme Court held the antitrust laws applicable to professional football and its reserve system, while continuing to distinguish baseball as the only sport encompassed within a prior direct determination in *Federal Baseball* to the contrary.

This development of an antitrust exemption for baseball, and baseball alone, is much-criticized, yet in *Radovich* the Supreme Court specifically addressed itself to this:

"If this ruling is unrealistic, inconsistent, or illogical, it is sufficient to answer, aside from the distinctions between the businesses, that were we considering the question of baseball for the first time on a clean slate we would have no doubts. But *Federal Baseball* held the business of baseball outside the scope of the Act. No other business claiming the coverage of those cases has such an adjudication. We, therefore, conclude that the orderly way to eliminate error or discrimination, if any there be, is by legislation and not by court decision. Congressional processes are more accommodative, affording the whole industry hearings and an opportunity to assist in the formulation of new legislation. The resulting product is therefore more likely to protect the industry and the public alike. The whole scope of congressional action would be known long in advance and effective dates for the legislation could be set in the future without the injustices of retroactivity and surprise which might follow court action. Of course, the doctrine of *Toolson* and *Federal Baseball* must yield to any congressional action and continues only at its sufferance." (footnote omitted)[32]

As of this date, Congress has not legislated to bring baseball within the federal antitrust laws. In the face of this unusual but very specific delegation to Congress, plaintiff has no choice but to seek to have *Toolson* overruled.

Plaintiff suggests four developments which might lead to an overruling of

**28.** 172 F.2d 402.

**29.** 346 U.S. 356, 74 S.Ct. 78, 98 L.Ed. 64.

**30.** Radovich v. National Football League, 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957); United States v. International Boxing Club, 348 U.S. 236, 75 S.Ct. 259, 99 L.Ed. 290 (1955); United States v. Shubert, 348 U.S. 222, 75 S.Ct. 277, 99 L.Ed. 279 (1955).

**31.** 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456.

**32.** 352 U.S. at 452, 77 S.Ct. at 394.

*Toolson.* First, he argues that the principle of freedom of contract in the labor market recognized by federal labor legislation must illuminate any interpretation of the antitrust laws and that this factor was not brought to the attention of the Supreme Court. However, the similar policy of freedom of contract set forth in the Thirteenth Amendment was expressly relied upon by Judge Frank of our Circuit in 1949 in Gardella v. Chandler as the reason why, in his view, the reserve system is "so opposed to the public policy of the United States that, if possible, [it] should be deemed within the prohibitions of the Sherman Act * * *." [33]

The Supreme Court was fully cognizant of that decision when *Toolson* was decided. Furthermore, the federal labor statutes and United States v. Hutcheson [34] on which plaintiff relies were cited throughout the briefs to the Supreme Court in *Toolson,* although for the different proposition that the alleged violation was a labor dispute exempt from the antitrust laws.[35]

■ Second, petitioner refers to the very substantial increment in both the revenue and coverage baseball has received from radio and television since 1953 and baseball's involvement with other enterprises generally, as evidence of its changing character. This argument appears more relevant to the question of interstate commerce [36] than to the issue of *stare decisis* on which *Toolson* is based. Moreover, the briefs of all parties [37] and Justice Burton's dissent [38] in *Toolson* gave considerable attention to the blossoming since the time of *Federal Baseball* of radio and television revenues for baseball.

■ Third, he points out that the baseball player draft begun in 1965 operates to deprive any new player desiring to enter professional baseball the right to even an initial choice where, among the various teams that may desire his talents, he will begin his playing career.[39] While the player draft does further increase the restrictions already placed on a player's freedom to negotiate, the fact that his freedom is now curtailed in the first year of his playing career as well as in every subsequent year does not appear to fundamentally add to the lifelong restraints which were already in exist-

33. 172 F.2d at 410.

34. 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788 (1941).

35. Brief for Respondents in Opposition to Petition for Certiorari, pp. 37–40; Petitioner's Reply Brief on Writ of Certiorari, pp. 5–11; Brief for Respondents, pp. 64–66.

36. The Supreme Court in *Toolson* indicated that its decision to continue baseball's antitrust immunity did not rest upon any view that baseball was not interstate commerce. We believe that baseball clearly constitutes a subject of commerce under the present concept of that term. See *e. g.,* NLRB v. Jones & McLaughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937). Further, in light of *Radovich* and the expansion since 1922 of the concept of interstate commerce, we have no doubt that baseball is in interstate commerce. See State v. Milwaukee Braves Inc., 31 Wis.2d 699, 144 N.W.2d 1 (1966).

37. *E. g.,* Petitioner's Opening Brief on Writ of Certiorari, pp. 38–43; Brief for Respondents, pp. 41–54; Brief for Petitioners (in companion case of Corbett v. Chandler, 346 U.S. 356, 74 S.Ct. 78, 98 L.Ed. 64), pp. 9–15.

38. 346 U.S. at 357–359, 74 S.Ct. 78, 98 L.Ed. 64.

39. It has been suggested that the baseball draft is considerably less restrictive than the draft systems of other professional sports. See Note, "Super Bowl and the Sherman Act: Professional Team Sports and the Antitrust Laws," 81 Harv.L.Rev. at 423, 425. Defendants argue that in any event the draft system was initiated long after plaintiff entered baseball and thus he lacks standing to raise this contention. We are inclined to disagree with defendants since plaintiff concededly has standing to attack the reserve system and merely wishes to establish as grounds for overruling *Toolson* that its effect has become more restrictive as a result of the draft. At least for purposes of this motion this question is resolved in plaintiff's favor.

ence at the time of *Toolson*. In any event, this additional restriction still does not present as severe a situation as faced the Supreme Court in *Toolson* itself. The complainants there were not merely restricted to one major league club; they were allegedly ostracized and totally barred from pursuing their livelihood in professional baseball.

Fourth, plaintiff argues that the impact of a retroactive decision, which was a principal factor leading the Supreme Court in *Toolson* to continue baseball's exclusion from the federal antitrust laws, need no longer be feared since plaintiff seeks only prospective relief. He argues that recent prospective decisions in the area of criminal law [40] foreshadow the possibility of similarly limiting any and all civil relief which may flow from a declaration of the illegality of the reserve system. It may very well be that a court could limit plaintiff and all others who may seek to hold defendants accountable for antitrust violations to injunctive relief and refuse to permit retroactive treble damages where the alternative to such a prospective holding would be to dismiss all claims because of defendants' justifiable reliance on past precedents.

While the latter may be a weighty argument for overruling *Toolson,* it is not our function to make that decision at this phase of the litigation.[41] The issue now before us, as already noted, is to determine the existing likelihood of that eventuality. Several weighty factors compel the conclusion that the overruling of *Toolson* is by no means the probable result of this litigation.

While we believe a decree in the civil area limiting not only plaintiff but all other litigants to prospective relief (despite the presence of a statute granting treble damages) in order to protect defendants' legitimate reliance interests would be salutory, we must nevertheless recognize that it would also be novel and nearly unprecedented. It is not at all certain that such a course will be adopted; yet without it plaintiff is largely left in the difficult position of simply arguing the illogic of Toolson's *stare decisis* reasoning in the face of the Supreme Court's previous determination in *Radovich* that while the baseball exemption may be illogical, if it is to be corrected Congress must do so.

Moreover, defendants contend that, regardless of whether or not past damages are awarded, a declaration that the reserve system is illegal and a grant of injunctive relief forbidding refusals to negotiate would still have a serious retrospective effect on the reliance interests of defendants. They assert that countless commitments have been made by all teams in organized baseball in reliance upon the validity of baseball's reserve system and exemption from federal antitrust laws.[42] Yet, they argue, while plaintiff concedes the need for some form of reserve system, the relief he seeks would result in a sudden termination of the present reserve system with the court lacking power to devise a substitute.

There is considerable force to defendants' position in this regard. The Supreme Court in *Radovich* elucidated the factors leading to its decision in *Toolson:*

"In *Toolson* we continued to hold the umbrella over baseball that was placed there some 31 years earlier by *Federal Baseball*. The Court did this because it was concluded that more harm would be done in overruling *Federal Baseball* than in upholding a ruling which at best was of dubious validity. Vast efforts had gone into the development and organization of baseball since that decision and enormous capital had been invested in reliance on its permanence.

---

40. Compare, *e. g.*, Desist v. United States, 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969).

41. As to the power of a lower federal court to "divine" whether a decision of the Supreme Court would be overruled on appeal, see Gardella v. Chandler, *supra*, 172 F.2d at 409 n. 1 (Frank, J.).

42. See Affidavit of Joseph E. Cronin, February 1, 1970.

Congress had chosen to make no change. All this, combined with the flood of litigation that would follow its repudiation, the harassment that· would ensue, and the retroactive effect of such a decision, led the Court to the practical result that it would sustain the unequivocal line of authority reaching over many years." [43]

We do not believe the "prospective" overruling suggested by plaintiff would vitiate all of these underpinnings of *Toolson.*

In *Radovich* the Supreme Court further specified that *Toolson* sought to avoid not only the "injustices of retroactivity" but also of *"surprise* which might follow court action." [44] The Supreme Court reasoned that Congress as opposed to the courts might avoid such sudden effects because its "processes are more accommodative" and "[t]he whole scope of congressional action would be known long in advance and *effective dates* for the legislation could be set in the future." [45]

■ Additionally, Congress' silence in the face of the Supreme Court's extraordinary invitation in *Toolson, Shubert* and finally *Radovich* to modify baseball's status may take on aspects of ratification.[46] Plaintiff correctly draws our attention to the general rule that the silence of Congress is of slight significance. However, we cannot ignore the unique attention paid in these three cases to the inactivity of Congress.[47]

Finally, decisions of the Supreme Court are not lightly overruled, particularly those which have a history as long as this one. The *Toolson* decision may be an anomaly, and there may (hopefully) be few such anomalies long-sustained by the law. Nevertheless, whatever may be our individual view of the "rightness" of plaintiff's claim, we are constrained to find that plaintiff has not made a sufficiently clear showing of reasonable likelihood of overruling ·the Supreme Court's direction that the corrective process lies with Congress and not with the courts.[48] Quite possibly plaintiff may succeed in ultimately overturning baseball's federal antitrust exemption, but it is not sufficiently probable now to justify the extraordinary preliminary relief he seeks.[49]

### b. Antitrust exemption for labor agreements

■ There is yet another substantial and complicated issue of law and fact between the parties which if resolved in defendants' favor would bar plaintiff from pressing his claim for federal antitrust relief from the reserve system. Defendants contend that the reserve system is embodied in their collectively bargained agreement with the Major League Baseball Players Association; that it is a mandatory subject of collective bargaining presently under negotiation and examination between defendants and the Players Association; and that, as a con-

---

43. 352 U.S. at 450, 77 S.Ct. at 393.

44. Radovich v. National Football League, 352 U.S. at 452, 77 S.Ct. at 394 (emphasis added).

45. *Id.* See Generally, Comment, "Monopsony in Manpower: Organized Baseball Meets the Antitrust Laws," 62 Yale L.J. at 636, 638–39.

46. See State v. Milwaukee Braves Inc., *supra.*

47. See, *e. g.,* United States v. Shubert, *supra,* 348 U.S. at 229–230, 75 S.Ct. at 282 where the Supreme Court stated: "And Congress, although it had actively considered the ruling, had not seen fit to reject it by amendatory legislation."

48. Portland Baseball Club Inc. v. Baltimore Baseball Club Inc., 282 F.2d 680 (9th Cir. 1960); Salerno v. American League, 1970 CCH Trade Cases ¶ 72,996 (S.D.N.Y.1969) (dismissing complaints).

49. In Martin v. National League Baseball Club, 174 F.2d 917, 918 (2d Cir. 1949), the Second Circuit, after having held baseball subject to the antitrust laws (after *Federal Baseball,* but prior to *Toolson*), nevertheless refused to issue a preliminary injunction on behalf of a player excluded from professional baseball because the question of the legality of the reserve system "may involve consideration, among other things, of the needs and conduct of the business as a whole."

sequence, the subject of this lawsuit is a matter exempt from the antitrust laws.[50]

Plaintiff, on the other hand, appears to concede that the reserve system is a mandatory bargaining subject. He argues that the Basic Agreement of the Players Association and the defendants does not comprise any present collectively bargained agreement regarding the reserve system;[51] further, that the reserve system has been imposed upon the players by the defendants without their consent and is not the result of collective bargaining.[52] Finally, he reasons that defendants are merely seeking to use this alleged labor agreement as "a cat's-paw to pull [their] chestnuts out of antitrust fires."[53]

The questions raised by the conflicting views of the parties as to a labor agreement exemption are substantial and complex. They afford yet another reason to conclude that plaintiff has failed to meet his burden of a clear showing of probability of success on the federal antitrust claims.

### 2. State Law Claims

Should he fail on the federal antitrust claim, plaintiff asserts in two separate causes of action that the reserve system nevertheless violates state law, both common and statutory. Choosing not to rest upon pendent jurisdiction, he alleges diversity of citizenship as the basis for federal jurisdiction. Here again, however one views the reasonable probability of success on his state statutory antitrust and common law claims he is confronted with the strong possibility that such claims are barred by federal preemption or the need for uniformity of regulation.

#### a. The supremacy and commerce clauses

Plaintiff argues that defendants cannot have it both ways; that if the federal antitrust laws do not reach baseball then the state antitrust laws and common law are applicable.

*Toolson*, however, was based, not on any supposed absence of interstate com-

---

50. Clayton Act § 20, 29 U.S.C. § 52; Norris-LaGuardia Act, 29 U.S.C. §§ 101–115. See United States v. Hutcheson, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788 (1941); Local Union No. 189, Amalgamated Meat Cutters & Butcher Workmen of North America v. Jewel Tea, 381 U.S. 676, 689–691, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965); American Federation of Musicians of United States and Canada v. Carroll, 391 U.S. 99, 105–106, 110, 88 S.Ct. 1562, 20 L.Ed.2d 460 (1968).

51. Although the Basic Agreement is somewhat internally inconsistent on this question (the Players Association agrees generally to the form of the Uniform Player Contract and to use their best efforts to ensure that all of its terms and conditions will be carried out in full), we are of the opinion solely on the basis of that which is before us that plaintiff is probably correct that the reserve system is not presently collectively agreed to. Article VIII of the Basic Agreement specifically provides for a joint review of possible alternatives to the reserve clause (which review is underway) and that the clubs shall not be obligated to bargain or seek agreement with the Players Association

with respect to the reserve clause during the term of the Agreement (which is still in effect).

52. Plaintiff may also be seeking to escape this often difficult process of reconciliation of labor and antitrust laws by contesting defendants' good faith in the present bargaining over the reserve system.

It would appear to us that the recourse for any failure by defendants to bargain in good faith should be to the National Labor Relations Board which has recently asserted its jurisdiction over the defendant baseball employers. See *American League* and *Association of Umpires*, 180 NLRB No. 30, Case 1–RC–10414 (December 15, 1969). In any event, this contention serves to emphasize the serious and difficult factual questions on this issue of collective bargaining between the parties.

53. United States v. Women's Sportswear Ass'n, 336 U.S. 460, 464, 69 S.Ct. 714, 716, 93 L.Ed. 805 (1949). See Allen Bradley Co. v. Local Union No. 3, I.B. E.W. 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945); United Mine Workers v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965).

merce, but on *stare decisis* and the acquiescence of Congress. In State v. Milwaukee Braves Inc.,[54] the Wisconsin Supreme Court held that state antitrust laws could not be applied to prevent transfer of a baseball franchise on the ground that state regulation was foreclosed by the Commerce and Supremacy Clauses of the United States Constitution. Certain of the majority were of the opinion that state regulation was preempted because it would interfere with a Congressional policy permitting self-regulation for baseball which they saw as implicit from the silence of Congress in this particular context.[55] Others in the majority preferred the view that the national character of organized baseball and the necessary interdependence of the teams requires uniformity of regulation and that "since organized baseball operates widely in interstate commerce, the regulation, if there is to be any, must be prescribed by Congress." [56]

We are of the opinion that plaintiff has failed to show sufficient likelihood that his state claims will not be barred by either federal preemption or the need for uniformity of regulation in an area of interstate commerce.[57] Although transfer of a team franchise is certainly distinguishable (particularly with regard to the likelihood of state discrimination in favor of its own economic interests) from restraints imposed by the reserve system upon players' freedom to negotiate, the reasoning of Milwaukee Braves still seems persuasive here.[58] From the information before us at this preliminary stage, there does appear to be a need for uniformity of treatment in a nationally organized professional team sport like baseball. We recognize that this leaves baseball unregulated by state or federal antitrust law, yet we are constrained to find that such a result appears to us mandated by existing and controlling law.

### b. Indispensable parties

In light of our determination above that plaintiff has failed to sustain his burden at this preliminary stage of showing probable success on his state law claims, we find it unnecessary to pass upon defendants' further contention with respect to lack of indispensable parties who, if joined, would destroy diversity of citizenship jurisdiction.

### 3. Involuntary Servitude

Plaintiff's fourth cause of action asserts that the reserve system violates the Thirteenth Amendment and federal civil rights statutes, 18 U.S.C. § 1581 and 42 U.S.C. § 1994, thereunder by imposing upon him a condition of involuntary servitude and violates the public policy declared in the Norris-LaGuardia Act, 29 U.S.C. §§ 102 and 103, by refusing him the right to negotiate his terms

---

54. 31 Wis.2d 699, 144 N.W.2d 1 (1966). See also, Musicians Union Local No. 6 v. Superior Court, Cal., 73 Cal.Rptr. 201, 447 P.2d 313, 317–318 (1968).

55. *Id.* at 17–18.

56. *Id.* at 18.

57. See generally, 8 B.C.Ind. & Com.L.Rev. 341 (1967); 35 Fordham L.Rev. 350 (1966).

Moreover, we have already noted that defendants raise a substantial issue as to their claim that the reserve system is a subject of collective bargaining. If this be so, then this would present yet another basis for finding federal preemption. See Local 24, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America v. Oliver, 358

U.S. 283, 79 S.Ct. 297, 3 L.Ed.2d 312 (1959).

58. In State v. Milwaukee Braves Inc., 144 N.W.2d at 15 the Court in broad, but persuasive dicta stated:

"We venture to guess that this exemption does not cover every type of business activity to which a baseball club or league might be a party and does not protect clubs or leagues from application of the federal acts to activities which are not incidental to the maintenance of league structure, but it does seem clear that the exemption at least covers the agreements and rules which provide for the structure of the organization and the decisions which are necessary steps in maintaining it."

and conditions of employment. Although none of these statutes expressly provide for a civil remedy, jurisdiction to grant relief for a violation of such provisions may be found in 28 U.S.C. §§ 1331 and 1343.[59]

Plaintiff's claims in this regard appear to have only dubious validity. He relies principally on the 1914 decision of a New York Supreme Court,[60] which is quoted with approval by Judge Frank in Gardella v. Chandler.[61] Judge Frank recognized that terming the reserve system "peonage" was "perhaps a bit exaggerated" and concluded that "I am not to be understood as implying that [it] violate[s] the Thirteenth Amendment or the statutes enacted pursuant thereto."[62]

Involuntary servitude has been narrowly defined. Plaintiff points to the broad statement of the Supreme Court in Pollock v. Williams:[63]

"The undoubted aim of the Thirteenth Amendment as implemented by the Antipeonage Act was not merely to end slavery but to maintain a system of completely free and voluntary labor throughout the United States."

Immediately following that general proposition, the Supreme Court in *Pollock* specified its holding:

"Congress has put it beyond debate that no indebtedness warrants a suspension of the right to be free from compulsory service. This congressional policy means that no state can make the quitting of work any component of a crime, or make criminal sanctions available for holding unwilling persons to labor."[64]

█ Plaintiff has not satisfied what appears to be an essential prerequisite to this cause of action, a showing of compulsory service, for he is free to quit and refuse to play ball for Philadelphia (even though the consequence of that choice may be to foreclose him from playing professional baseball).[65] We do not believe he has demonstrated a reasonable probability of success on this claim.

### 4. No Showing of Reasonable Probability of Success

With regard to each of the four relevant claims asserted by plaintiff, we are constrained by controlling precedents to find that he has not shown sufficient probability of ultimate success to justify granting the only relief plaintiff seeks at this time—the issuance of a preliminary injunction.

## II

### *Injunctions Prohibited*

█ Defendants' final argument for denial of a preliminary injunction is that apart from questions of irreparable injury and probable success, the activities sought to be enjoined involve or grow out of a "labor dispute"[66] and in such cases this court has no jurisdiction to issue the injunction sought by plaintiff.[67]

59. See Bryant v. Donnell, 239 F.Supp. 681, 683 (W.D.Tenn.1965). See also Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946).

60. American League Baseball Club v. Chase, 86 Misc. 441, 465, 149 N.Y.S. 6, 19 (1914).

61. 172 F.2d 402, 409–410 (2d Cir. 1949).

62. *Id.* at 410.

63. 322 U.S. 4, 17, 64 S.Ct. 792, 799, 88 L.Ed. 1095 (1944).

64. *Id.* at 18, 64 S.Ct. at 799.

65. See Wicks v. Southern Pacific Co., 231 F.2d 130, 138 (9th Cir.), cert. denied, Wicks v. Brotherhood of Maintenance of Way Emp. Southern Pac. Co., 351 U.S. 946, 76 S.Ct. 845, 100 L.Ed. 1471 (1956); United States v. Shackney, 333 F.2d 475 (2d Cir. 1964); Bryant v. Donnell, *supra*, 239 F.Supp. at 685.

66. Norris-LaGuardia Act §§ 13(a) and (c), 29 U.S.C. §§ 113(a) and (c). Defendants contend that the reserve system is acknowledged to be a mandatory bargaining subject and plainly concerns "terms and conditions of employment" and, thus, must constitute a labor dispute.

67. Clayton Act § 20, 29 U.S.C. § 52; Norris-LaGuardia Act §§ 4 and 5, 29 U.S.C. §§ 104(a) and 105. See Clune v. Publishers Association of N. Y. City, 214

Whether plaintiff's action grows out of a labor dispute and, if so, whether injunctive relief against a boycott in restraint of trade might nevertheless be permitted here under the authority of Allen Bradley Co. v. Local Union No. 3, I. B. E. W.,[68] present substantial, complicated and difficult questions of fact and law.[69] It is appropriate here to recall that our circuit has cautioned that "there is special need for restraint in granting interlocutory relief" in antitrust actions involving an alleged labor dispute "where courts must reconcile the sometimes conflicting policies of four acts of Congress, two of which explicitly deprive a Federal court of 'jurisdiction' to issue an injunction * * *." [70]

## III

### Conclusion

For years professional ballplayers have chafed under the restrictions of baseball's reserve system; a long line of litigation so attests. Many of their grievances appear justified. Yet, regretfully, as the Supreme Court stated in *Radovich* we are not writing here on a clean slate. Recognizing the equity of plaintiff's claims, we must also recognize the existing, well-established and controlling precedents against his position.

If plaintiff is to achieve by court action the fundamental change he seeks in the reserve system, then we believe that such a determination on a matter of vital importance to organized baseball and with such potential for opening the floodgates to litigation must at least be the result of a full trial and not on the basis of a motion for preliminary relief.[71] To grant plaintiff the preliminary injunction he seeks would work the type of unfair surprise and carry the same sort of sudden effect that the Supreme Court in *Toolson* was at such pains to prevent.

Accordingly, we are constrained to deny plaintiff's motion for the extraordinary remedy of a preliminary injunction. As a matter of law, we are powerless to hold otherwise.

So ordered.

F.Supp. 520 (S.D.N.Y.), aff'd, 314 F.2d 343 (2d Cir. 1963).

68. 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945).

69. The Supreme Court evidently disagreed with somewhat similar arguments put forth by the defendants in Radovich v. National Football League, 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957). In *Radovich* one of respondents' arguments for affirmance of the lower court's dismissal of the complaint was that the claimed illegality of professional football's reserve system under which the petitioner was barred from football constituted a labor dispute and was exempt from the antitrust laws. See Brief for Respondents, pp. 53–63; Petitioner's Reply Brief, pp. 20–21. The Supreme Court, in holding professional football subject to federal antitrust laws and the complaint improperly dismissed, stated, "[r]espondents' remaining contentions we believe to be lacking in merit." 352 U.S. at 454, 77 S.Ct. at 395.
It is significant, however, that neither party in *Radovich* claimed that the reserve system was a product of or subject to collective bargaining. See generally, Comment, "Monopsony in Manpower: Organized Baseball Meets the Antitrust Laws," 62 Yale L.J. at 619–20, 635–36 (in 1953 in baseball there was apparently no negotiation or consultation with the players regarding the uniform contract).

70. See Carroll v. American Fed. of Musicians, 310 F.2d 325 (2d Cir. 1962).

71. Martin v. National League Baseball Club, 174 F.2d 917 (2d Cir. 1949).