**Curtis C. FLOOD, Plaintiff,**

v.

**Bowie K. KUHN, Individually and as Commissioner of Baseball, et al., Defendants.**

**No. 70 Civ. 202.**

United States District Court,
S. D. New York.

Aug. 12, 1970.

Paul, Weiss, Goldberg, Rifkind, Wharton & Garrison, New York City, Allan H. Zerman, Clayton, Mo., for plaintiff; Arthur J. Goldberg, Jay H. Topkis, Richard M. Moss, Daniel Levitt, Max Gitter, William D. Iverson, New York City, of counsel.

Donovan, Leisure, Newton & Irvine, New York City, for defendant Bowie K. Kuhn; George S. Leisure, Jr., John E. Tobin, New York City, of counsel.

Arnold & Porter, Washington, D. C., for defendant Bowie K. Kuhn; Paul A.

Porter, Victor H. Kramer, Washington, D. C., Douglas G. Robinson, Washington, D. C., of counsel.

Willkie, Farr & Gallagher, New York City, for all defendants except Bowie K. Kuhn; Louis F. Carroll, Mark F. Hughes, Louis L. Hoynes, Jr., Barry Rona, Robert J. Kheel, New York City, of counsel.

Baker, Hostetler & Patterson, Cleveland, Ohio, for defendant Joseph E. Cronin, President of American League of Professional Baseball Clubs, and all American League Clubs; Alexander H. Hadden, James P. Garner, G. Warren Daane, Sargent Karch, Cleveland, Ohio, of counsel.

COOPER, District Judge.

On October 8, 1969, Curtis C. Flood, then a major league professional baseball player for the St. Louis Cardinals, was "traded," his contract transferred and assigned to another National League baseball club, the Philadelphia Phillies, as part of a multi-player transaction between the two clubs. At the time of the trade he was thirty-two years old, a veteran of twelve years service with the Cardinals, co-captain of the team, and acknowledged to be a player of exceptional and proven baseball ability. Unhappy and disappointed, Flood was unwilling to play for Philadelphia, but forbidden by his contract and the rules of organized professional baseball from negotiating with any other ball club.

He initiated this action on January 16, 1970 against the twenty-four major league clubs comprising the American and National Leagues of organized baseball, their respective Presidents, and against the Commissioner of Baseball asserting in four separate causes of action that baseball's "reserve system" is unlawful.[1] Briefly stated, the reserve system, commonly referred to as the "reserve clause," consists of a number of baseball rules, regulations and uniform contract terms which together operate to bind a player to a ball club and restrict him to negotiating with that club only.

The first of plaintiff's four causes of action alleges that the reserve system constitutes a conspiracy among the defendants to boycott the plaintiff and to prevent him from playing baseball other than for the Philadelphia club in violation of the Sherman and Clayton Anti-Trust Acts. His second and third causes of action are state law claims against eleven of the twenty-four club defendants[2] with jurisdiction based on diversity of citzenship. The second contends that the reserve system and defendants' practices thereunder constitute violations of the antitrust laws of New York, California and the other states where major league baseball is played and also violate state civil rights statutes, while the third contends that by the reserve system defendants have restrained the plaintiff's "free exercise of playing professional baseball in New York, California, and the several states in which defendants stage baseball games, in violation of the common law." His fourth cause of action, directed against thirteen club defendants and alleging federal question and civil rights jurisdiction under 28 U.S.C. §§ 1331 and 1343, asserts that the reserve system is a form of peonage and involuntary servitude in violation of the anti-peonage statutes, 42 U.S.C. § 1994 and 18 U.S. C. § 1581, and the Thirteenth Amendment and that it deprives him of "freedom of labor" in violation of the Norris-LaGuardia Act, 29 U.S.C. §§ 102, 103.

By way of relief plaintiff seeks a declaration of the illegality of baseball's reserve system, an injunction restraining defendants from agreeing among themselves to refuse him employment, and certain damages allegedly sustained

---

1. A fifth and largely unrelated cause of action against the St. Louis Cardinals and New York Yankees attacked as anticompetitive and in violation of federal anti-trust laws certain alleged relationships between those clubs and other non-baseball enterprises.

2. No individual is named as a defendant.

since December 30, 1969 as a result of defendants' refusal to bargain with him as a free agent.

Following the filing of his complaint, plaintiff moved before this Court on February 3, 1970 for a preliminary injunction declaring him a free agent, or, as we viewed it alternatively, permitting him to remain as a player for St. Louis pending a final determination of the merits. On March 4, 1970 we denied this application for an injunction *pendente lite* on the grounds that it would disturb the status quo; that the balance of hardship did not tip decidedly in plaintiff's favor; and that there was insufficient showing of probable eventual success on the merits of any of his four causes of action. Flood v. Kuhn, 309 F. Supp. 793 (S.D.N.Y.1970).

On March 24, 1970 we granted plaintiff's application for an early trial. On April 23, 1970 we deferred action, pursuant to Rule 12(d), F.R.Civ.P., on defendants' motions to dismiss the first four causes of action, but granted summary judgment dismissing the unrelated fifth cause of action above-mentioned against the St. Louis Cardinals and New York Yankees. Flood v. Kuhn, 312 F. Supp. 404 (S.D.N.Y.1970).

The remaining four causes of action contesting the legality of baseball's reserve system were tried to this Court from May 19 to June 10, 1970. The trial record consists of some 2000 pages of transcript and 56 exhibits. At the close of trial we reserved decision and fixed July 13, 1970 as the date for all post-trial memoranda.

We resolved to allow great liberality in the making of the total trial record to the end that each theory or contention advanced by the litigants would be amply covered and dealt with when all the proof was in.

### Baseball and the Reserve System

Baseball is our national pastime and has been so for well over a century. Most of our interest in the sport as fans and spectators centers around professional or organized baseball. Organized baseball consists of the twenty-four major league teams which comprise the American and National Leagues and the various tiers of minor leagues which serve principally as training grounds for aspiring players. Tr. 645–46.[3] There exist no competitive professional teams in North America outside this structure. *Id.* All are governed by either the Major League Rules or the corresponding Professional Baseball Rules (applicable to the minor leagues) and are subject to the broad powers of the Commissioner of Baseball. Tr. 647–52; Major League Agreement, Articles I, IV, VII, IX.

At the center of this single, unified but stratified organization of baseball leagues is the reserve system, the essence of which has been in force for nearly one hundred years, almost the entire history of organized professional baseball. All teams in organized baseball agree to be bound by and enforce its strictures. It is perhaps the cornerstone of the present structure in that it insures team continuity and control of a supply of ballplayers. It is the heart of plaintiff's complaint.

From the standpoint of the professional baseball player, its effect is to deny him throughout his career freedom to choose his employer. Since 1965 each new player seeking to enter baseball has been exposed to a draft by the major and minor league clubs. See Major League Rule 4. If selected by a club in this semi-annual draft, he may bargain only with that club; should he wish not to play for that club he must wait until the next draft is held. *Id.*

Regardless of whether his entry into organized baseball is through the player draft or as a free agent, he must sign a Uniform Player's Contract, the only form of contract permitted between player and club, which empowers the signing club unilaterally to renew his contract continuously from year to year should he and the club fail to come to

---

3. "Tr." followed by a number refers to pages of the trial transcript herein.

terms on a new agreement.[4] Once signed he is thereafter forbidden to negotiate toward prospective baseball employment with any club other than the one to whom he is under contract.[5] Thus, the club has a right to his services for as long as it wishes to renew his contract, subject only to his right to retire from baseball. The total number of ballplayers so controlled is limited by the provision that no major league club may have over forty active players under contract and on its reserve list.[6]

If it chooses, a club may assign a player's contract to another club without consulting the player or obtaining his consent.[7] Should his contract be assigned his new club becomes heir to all of the above-mentioned rights and obligations vis-a-vis the player.[8] If a play-

4. Rule 3(a) of the Major League Rules and Professional Baseball Rules agreed to by all professional baseball clubs requires that each club contract with its players only pursuant to the Uniform Player Contract prescribed by the Major League Executive Council and specifically that "no club shall make a contract * * * containing a non-reserve clause." Further, "[t]he making of any agreement between a club and a player not embodied in the contract shall subject both parties to discipline; and no such agreement, whether written or verbal, shall be recognized or enforced."
The renewal clause is contained in paragraph 10(a) of the Uniform Player Contract and provides that if in the year of expiration of the contract a player and club do not reach agreement on a new contract by a certain date "the Club shall have the right by written notice to the Player at [his] address to renew this contract for the period of one year on the same terms, except that the amount payable to the Player shall be such as the Club shall fix in said notice * * * at a rate not less than 80% of the rate stipulated for the preceding year." Any contract so renewed would itself contain this renewal clause.

5. Rule 3(g) of the Major League and Professional Baseball Rules provides:
"(g) TAMPERING. To preserve discipline and competition, and to prevent the enticement of players, coaches, managers and umpires, there shall be no negotiations or dealings respecting employment, either present or prospective, between any player, coach or manager and any club other than the club with which he is under contract or acceptance of terms, or by which he is reserved, or which has the player on its Negotiation List, * * * .unless the club or league with which he is connected shall have, in writing, expressly authorized such negotiations or dealings prior to their commencement."

6. The reserve rule, Major League Rule 4–A, provides in part:

"On or before November 15 in each year, each Major League Club shall transmit to the Commissioner and to its League President a list of not exceeding forty (40) active and eligible players, whom the club desires to reserve for the ensuing season; and also a list of all its players who have been promulgated as placed on the Military, Voluntarily Retired, Restricted, Disqualified, Suspended or Ineligible Lists; and such players signed under Rule 4 who do not count in the club's under control limit. * * * [N]o player on any list shall be eligible to play for or negotiate with any club until his contract has been assigned or he has been released."

Of the forty active players on a club's reserve list, fifteen are generally minor league players since a major league team may have a maximum of twenty-five players on its active roster. Major League Rule 2. There are more players in the minor leagues than these remaining fifteen players reserved by each major league club. These minor league players who are not reserved by a major league club may in turn be reserved by their minor league club. Professional Baseball Rules 2 and 4–A. Such players are also subject to an annual draft by all the major league clubs. Rule 5 of the Major League and Professional Baseball Rules.

7. Rule 9 of the Major League and Professional Baseball Rules provides in part:
"A club may assign to another club an existing contract with a player. The player, upon receipt of written notice of such assignment is by his contract [paragraph 6(a) of the Uniform Player Contract] bound to serve the assignee."

8. Rule 9 of the Major League and Professional Baseball Rules further provides in part:
"After the date of such assignment all rights and obligations of the assignor

er refuses to sign his contract and play, as Flood has, he is placed on a Restricted List whereby the club last holding his contract, in this case Philadelphia,[9] retains the exclusive right to negotiate with the player.[10] Only if released does a player become a free agent; he cannot achieve such status by his own choosing.[11]

Plaintiff's witnesses in the main concede that some form of reserve on players is a necessary element of the organization of baseball as a league sport, but contend that the present all-embracing system is needlessly restrictive and offer various alternatives which in their view might loosen the bonds without sacrifice to the game.[12] Plaintiff points to the present experience of other professional sports such as football, basketball and hockey, each of which survives relatively comfortably with a reserve system or organizational structure whose elements to a varying extent offer more freedom of choice and flexibility to its players. Tr. 448–590 (see especially: football, Tr. 463, 466–67, 480, 490; basketball, Tr. 520–23; hockey, Tr. 552–53, 559–60,

569, 572, 577, 582–84, 587); Plaintiff's Exhibits 12, 13, 14, 16, 17, 18, 19 and 20 in evidence.

The defendant clubs and Commissioner of Baseball, on the other hand, contend that the restrictions of the present system are reasonable and necessary to preserve the integrity of the game, maintain balanced competition and fan interest, and encourage continued investment in player development; that none of the alternatives suggested by plaintiff would be workable and still satisfy all three of these criteria; and that, upon comparison, baseball with its player safeguards[13] is hardly more restrictive in its reserve system than are the other professional sports. See Tr. 652–913, 932–1121, 1232–1545. Defendants point to the instability in the early history of baseball and before institution of the reserve system as evidence of the danger to be anticipated from any modification of its substance. See Plaintiff's Exhibit 15–A in evidence (the Celler Report entitled "Organized Baseball," Subcommittee on the Study of Monopoly Power of the Committee of the Judi-

---

clubs thereunder shall become the rights and obligations of the assignee club except as otherwise provided in Rule 4.
\* \* \*"

9. By virtue of the assignment of Flood's contract by St. Louis to Philadelphia and the exercise by Philadelphia of its option to renew.

10. Rule 15, Major League and Professional Baseball Rules.

11. Before a player may be unconditionally released and his contract terminated he must be placed on waivers making his contract available to every other major league club. Major League Rule 8. See also, Uniform Player Contract, paragraph 7.

12. Modifications of and alternatives to the present reserve system suggested by plaintiff include: (a) independent competitive leagues; (b) limitation of club control over a player to a fixed term of years; (c) permitting a player to become a free agent after an option period; (d) trade veto for veteran players; (e) minimum salary progression; (f) reduction in the number of reserved players; (g) salary

arbitration. Consideration was given them both individually and in combination. Various refinements were advanced to meet certain objections raised as to proposals (b) and (c), including a right of first refusal given to the player's club to match any offer obtained by the player, a restriction of negotiations to only clubs in the other league and then only in the off-season, and/or a more equalized division of baseball revenues among clubs. See Tr. 221–22, 235, 237–38, 247, 255–58, 1966–67, 1981–84, 1985–86, 2020–23.

13. Defendants include the following safeguards of fair treatment: (a) the forty player reserve limit (Major League Rule 4–A); (b) the waiver rules (Major League Rule 10); (c) the minor league draft (Major League Rule 5); (d) the maximum permissible salary cut provision (Uniform Player Contract, para. 10); (e) termination pay (Uniform Player Contract, para. 7); (f) the requirement of consent before assigning a veteran to the minor leagues (Major League Rule 9 (g)); (g) the minimum salary provision (Uniform Player Contract); (h) Major League Baseball Players Benefit Plan.

ciary of the House of Representatives, 82nd Cong., 2d Sess. (1952)).

*The Reserve System—a Necessity?*

Prior to trial we gained the impression that there was a view, held by many, that baseball's reserve system had occasioned rampant abuse and that it should be abolished. We were struck by the fact, however, that the testimony at trial failed to support that criticism; we find no general or widespread disregard of the extremely important position the player occupies. Cf. note 16, *infra.*

Clearly the preponderance of credible proof does not favor elimination of the reserve clause. With the sole exception of plaintiff himself,[14] it shows that even plaintiff's witnesses do not contend that it is wholly undesirable; in fact they regard substantial portions meritorious. It lends support to our view, expressed at another point in this opinion, that arbitration or negotiation would extract such troublesome fault as may exist in the present system and, preserving its necessary features, fashion the reserve clause so as to satisfy all parties.

Thus, former baseball star Jack (Jackie) Robinson responded to questioning in this regard as follows:

"Q Do I understand, however you interpret the expression 'reserve clause' or 'reserve system,' that your testimony is that you favor modifications of that system? Is that right?

A [Robinson] That is correct, I do.

Q You don't favor destruction of the system, do you?

A No, Sir." Tr. 217. See Tr. 218–19. See also Tr. 198, 216.

Witness Henry (Hank) Greenberg, also a former star player, was of the opinion:

"I think the players themselves, having functioned under the reserve system all these years, recognize the fact that the club has some equity in the players' services. * * *" Tr. 247. See also, Tr. 236, 248.

And former club owner William Veeck declared:

"Well, the complete elimination of the reserve system or the reserve clause in contracts I think would not be helpful to baseball. I am afraid that if you suddenly terminated and there was no control of contracts by any club, that it could—and I say only could—result in some rather chaotic conditions. I feel, however, that this would not be the case if it were done in an orderly manner.

\* \* \* \* \* \*

I feel that there should be some kind of a contractual relationship extending over a period of years. * * I don't mean it should stop and there should be nothing in its place." Tr. 1965, 1966.

*The Federal Antitrust Claim*

The Supreme Court held in 1922 that professional baseball was not within the scope of the federal antitrust laws because the exhibitions were purely state affairs to which the interstate transportation of players was merely incidental and were not trade or commerce in the ordinarily accepted use of the words. Federal Baseball Club of Baltimore, Inc. v. National League of Professional Baseball Clubs, 259 U.S. 200, 42 S.Ct. 465, 66 L.Ed. 898 (1922).

When this question again reached the Supreme Court in 1953, intervening decisions appeared to have vitiated any holding that baseball was not subject to the antitrust laws because its activities either did not sufficiently affect or were not interstate commerce. See Gardella v. Chandler, 172 F.2d 402 (2d Cir. 1949). Without reexamining this underlying issue of interstate commerce, however, the Supreme Court reaffirmed its prior decision in *Federal Baseball* "so

---

14. Flood stated near the close of his testimony, "I would like the whole system to be struck down and declared illegal," adopting as his view the proposition that

"no provision in that system * * * is beneficial either to the players or to organized baseball." Tr. 118 and 121.

far as that decision determines that Congress had no intention of including the business of baseball within the scope of the federal antitrust laws." Toolson v. New York Yankees, Inc., 346 U.S. 356, 74 S.Ct. 78, 98 L.Ed. 64 (1953). The reasons assigned for that conclusion were that baseball had developed for thirty years in reliance on its "understanding that it was not subject to existing antitrust legislation;" that Congress had not seen fit to bring baseball under the antitrust laws "by legislation having prospective effect;" that the existing legislation should not be held applicable with "retrospective effect;" and that "if there are evils in this field which now warrant application to it of the antitrust laws it should be by legislation."

Subsequent decisions established that *Toolson* "was a narrow application of the rule of *stare decisis*" applicable only to baseball and to no other industry or professional sport. Radovich v. National Football League, 352 U.S. 445, 77 S. Ct. 390, 1 L.Ed.2d 456 (1957); United States v. International Boxing Club, 348 U.S. 236, 75 S.Ct. 259, 99 L.Ed. 290 (1955); United States v. Shubert, 348 U.S. 222, 75 S.Ct. 277, 99 L.Ed. 279 (1955). Specifically, four years after *Toolson*, the Supreme Court held the antitrust laws applicable to professional football and its reserve system, while continuing to distinguish baseball as the only sport encompassed within its prior contrary determination in *Federal Baseball*. See Radovich v. National Football League, *supra*.

In brief, plaintiff asserts the following in support of his contention that these decisions do not bar this Court from anticipating their demise and granting him relief:

"Changes in baseball since 1922, or even since 1953, have thrust the game squarely within contemporary concepts of interstate commerce. And the reliance interests of the team owners, when properly analyzed in light of the liberalized doctrine allowing prospective relief and the plaintiff's request for only such relief, presents no barrier. Finally, the silence of Congress since 1953 argues for, rather than against, a judicial reexamination of the discretionary judgment exercised in *Toolson*." Plaintiff's Post-Trial Brief, July 7, 1970, p. 47.

In our decision of March 4, 1970 denying plaintiff a preliminary injunction, we considered in some depth these and certain other arguments made by plaintiff and concluded that "several weighty factors compel the conclusion that the overruling of *Toolson* is by no means the probable result of this litigation." Flood v. Kuhn, 309 F.Supp. 793, 801–805 (S.D.N.Y.1970). In general, we based this conclusion on the fact that *Toolson* held Congress had no intention to bring baseball within the antitrust laws, and did not rest on any presumed absence of interstate commerce; that prospective relief of the nature envisaged by plaintiff would be unprecedented; that, in any event, such court-imposed relief might still have a serious retrospective effect on the reliance interests of baseball; that the continued silence of Congress may take on aspects of ratification in light of the importance attached thereto in these decisions of the Supreme Court; and, finally, that "decisions of the Supreme Court are not lightly overruled, particularly those which have a history as long as this one * * * whatever may be out view of the rightness of plaintiff's claim. * * * " We find the trial before us amplifies those expressed views.

Subsequent to our determination of the motion for a preliminary injunction and to the trial of the issues herein, we were supported in these same views by the recent decision of our Circuit in Salerno and Valentine v. American League of Professional Baseball Clubs et al., 429 F.2d 1003 (2d Cir., July 13, 1970). *Salerno* is unquestionably conclusive, at least at this level, of the Federal antitrust issues herein. The panel in an

**278**

opinion by Judge Friendly unanimously held:

"We freely acknowledge our belief that *Federal Baseball* was not one of Mr. Justice Holmes' happiest days, that the rationale of *Toolson* is extremely dubious and that, to use the Supreme Court's own adjectives, the distinction between baseball and other professional sports is 'unrealistic,' 'inconsistent' and 'illogical.' Radovich v. National Football League, 352 U.S. 445, 452, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957). We add that Boys Mkts., Inc. v. Retail Clerk's Local 770, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199, decided June 1, 1970, overruling Sinclair Refining Co. v. Atkinson, 370 U.S. 195, 82 S.Ct. 1328, 8 L.Ed.2d 440 (1962), despite Congress' failure to act on invitations to do so, may presage a change from the attitude with respect to such inaction that was expressed in *Toolson*, 346 U.S. at 357, 74 S.Ct. 78, which Mr. Justice Black in dissent invoked to no avail. However, putting aside instances where factual premises have all but vanished and a different principle might thus obtain, we continue to believe that the Supreme Court should retain the exclusive privilege of overruling its own decisions, save perhaps when opinions already delivered have created a near certainty that only the occasion is needed for pronouncement of the doom. While we should not fall out of our chairs with surprise at the news that *Federal Baseball* and *Toolson* had been overruled, we are not at all certain the Court is ready to give them a happy despatch."

■■■ *Salerno* mandates that plaintiff's federal antitrust claims be denied. Since baseball remains exempt from the antitrust laws unless and until the Supreme Court or Congress holds to the contrary, we have no basis for proceeding to the underlying question of whether baseball's reserve system would or would not be deemed reasonable if it were in fact subject to antitrust regulation.

*Labor Antitrust Exemption*

Despite our firm belief (as hereinafter advanced) that these issues can and should be resolved by negotiations between the players and the club owners, we remain in doubt as to whether this matter stands exempt from the antitrust laws because it is a mandatory subject of collective bargaining. Defendants contend that a consistent application of Amalgamated Meat Cutters v. Jewel Tea Co., 381 U.S. 676, 85 S.Ct. 1596, 14 L. Ed.2d 640 (1965) admits of no other result. Plaintiff submits that defendants misread *Jewel Tea*; that "benefits to organized labor cannot be utilized as a cat's paw to pull employers' chestnuts out of the antitrust fires;" and that United States v. Women's Sportswear Mfr's Ass'n, 336 U.S. 460, 464, 69 S.Ct. 714, 716, 93 L.Ed. 805 (1949) requires rejection of an antitrust immunity for this reserve system created and imposed by the club owners long before the arrival of collective bargaining.

We need not reach this difficult question in light of our disposition that the Supreme Court alone is privileged to overrule *Toolson* and hold baseball subject to the antitrust laws.

*State Law Claims*

Plaintiff next asserts in two separate causes of action that the reserve system violates state law, both statutory and common. He argues that defendants cannot have it both ways; that if the federal antitrust laws do not reach baseball then state antitrust, civil rights and labor statutes and common law are applicable. We disagree.

Plaintiff would surely be correct if *Toolson* were no more than a reaffirmation of *Federal Baseball* based on a supposed absence of interstate commerce. However, *Toolson* cannot be so read. As our Circuit recently held, "the ground upon which *Toolson* rested was that Congress had no intention to bring baseball within the antitrust laws, not that baseball's activities did not sufficiently affect interstate commerce." *Salerno*

and Valentine v. American League of Professional Baseball Clubs et al., *supra.*

As interstate commerce, baseball is subject to regulation by Congress. Cf. American League and Ass'n of Umpires, 180 N.L.R.B. No. 30, Case 1–RC–10414 (December 15, 1969). It has been held exempt from existing antitrust legislation covering other related and integrated activities. It is not for this Court to write off *Toolson* as an anomaly. Its rationale must be given effect. We believe it unlikely that the Supreme Court would have held, as it did, that baseball's reliance interests precluded overruling *Federal Baseball* and that "Congress had no intention of including the business of baseball within the scope of the federal antitrust laws," if it considered baseball vulnerable to state regulation. Enforcement of such state laws would appear to produce a result inconsistent with the objective of the federal antitrust laws interpreted by the Supreme Court as excluding the business of baseball.

Thus, we agree with the reasoning expressed by certain of the majority of the Supreme Court of Wisconsin in holding its state antitrust laws could not be applied to prevent transfer of a baseball club franchise:

"The [United States Supreme] court has also said that while various tests may be used for guidance as to the regulatory power left to the states where Congress is silent, the ultimate question is whether the state action conflicts with national policy. * * *

* * * * * *

The situation which confronts us is not one where Congress has been silent as to a particular type of regulation in a broad field of interstate commerce, where the proposition may readily be implied that although no need has been found for federal regulation, state regulation of local aspects may be quite appropriate. Rather, here, Congress has remained silent as to regulation of a particular industry, either by imposition of antitrust laws or otherwise, in the face of and seemingly in response to a series of judicial decisions which uniquely and emphatically pose the question to Congress of whether there shall be regulation in antitrust terms or otherwise.

* * * * * *

It is plausibly argued that silence of Congress in this context demonstrates congressional recognition that league structure and the related agreements and rules are integral parts of professional baseball as it exists, and that the application of the familiar type of antitrust legislation to the structural arrangements of organized baseball is inappropriate; * * * that there is to be self-regulation until such time as Congress decides that the public interest requires other control.

* * * * * *

* * * We deem it unrealistic to interpret these decisions of the supreme court of the United States plus the silence of Congress as creating a mere vacuum in national policy, leaving the states free to regulate the membership of the baseball leagues." State v. Milwaukee Braves, Inc., 31 Wis.2d 699, 144 N.W.2d 1, 16–18, cert. denied, 385 U.S. 990, 87 S.Ct. 598, 17 L.Ed.2d 451 (1966). See also, *id.* at n. 17.

Although transfer of a team franchise is certainly distinguishable (particularly with regard to the likelihood of state discrimination in favor of its own economic interests) from restraints imposed by the reserve system upon players' freedom to negotiate, the reasoning of *Milwaukee Braves* is still persuasive here. The reserve system, which was the subject of Toolson's complaint, certainly falls squarely within the scope of baseball's federal antitrust exemption and, thus, within the area preempted from state regulation.

Even if the Supreme Court decisions and the silence of Congress fail to establish or indicate a national policy regarding baseball sufficiently certain to rise to the level of federal preemption, nevertheless we believe the nationwide char-

acter of organized baseball combined with the necessary interdependence of the teams requires that there be uniformity in any regulation of baseball and its reserve system. In *Milwaukee Braves* the other members of the majority preferred the view, at least as to matters such as league structure, that "since organized baseball operates widely in interstate commerce, the regulation, if there is to be any, must be prescribed by Congress." *Id.* at 18.

■ We do not believe that the operation of baseball and its reserve system is a matter which admits of diversity of treatment. State and local laws may not unduly burden interstate commerce.

"When the regulation of matters of local concern is local in character and effect, and its impact on the national commerce does not seriously interfere with its operation, and the consequent incentive to deal with them nationally is slight, such regulation has been generally held to be within state authority. * * *

But ever since Gibbons v. Ogden, [9 Wheat. 1, 6 L.Ed. 23,] * * * the states have not been deemed to have authority to impede substantially the free flow of commerce from state to state, or to regulate those phases of the national commerce which, because of the need of national uniformity, demand that their regulation, if any, be prescribed by a single authority. * * Whether or not this long-recognized distribution of power between the national and the state governments is predicated upon the implications of the commerce clause itself * * * or upon the presumed intention of Congress, where Congress has not spoken * * * the result is the same." Southern Pacific Co. v. Arizona ex rel. Sullivan, 325 U.S. 761, 767–768, 65 S.Ct. 1515, 1519, 89 L.Ed. 1915 (1945).

As we see it, application of various and diverse state laws here would seriously interfere with league play and the operation of organized baseball. Cf. American League and Ass'n of Umpires, *supra.*

Accordingly, plaintiff's state law claims, common law and statutory alike, must be denied. Just as we found it unnecessary to determine whether plaintiff's federal antitrust claims were barred by the labor antitrust exemption, so too, here, we need not resolve whether Local 24, International Brotherhood of Teamsters etc. Union v. Oliver, 358 U.S. 283, 296, 79 S.Ct. 297, 3 L.Ed.2d 312 (1959) applies and whether the federal labor law scheme leaves no room for the application of state antitrust policy to baseball's reserve system.

### Involuntary Servitude Claim

■ Plaintiff's fourth cause of action asserts that the reserve system violates the Thirteenth Amendment and its enforcing legislation which similarly prohibits holding any person to "involuntary servitude," 18 U.S.C. § 1584.[15] Although neither expressly provides for a civil remedy, jurisdiction to grant relief for a violation of such provision may be found in 28 U.S.C. §§ 1331 and 1343. See Reitmeister v. Reitmeister, 162 F. 2d 691, 694 (2d Cir. 1947); Bryant v. Donnell, 239 F.Supp. 681, 683 (W.D. Tenn.1965). See also, Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946).

Plaintiff acknowledges that this claim presents a case of first impression. He relies principally on a 1914 decision of a New York Supreme Court, American League Baseball Club v. Chase, 86 Misc. 441, 465, 149 N.Y.S. 6, 19 (1914), which is quoted from at some length by Judge

---

15. Plaintiff's post-trial brief argues only that the reserve system creates a system of involuntary servitude. Apparently, he no longer contends either that such a system creates a condition of peonage, 18 U.S.C. § 1581 and 42 U.S.C. § 1994, or that it violates the public policy declared in the Norris LaGuardia Act, 29 U.S.C. §§ 102, 103. We have considered such sections nevertheless and have concluded that they have no application here.

Frank in Gardella v. Chandler, 172 F. 2d 402, 409–410 (2d Cir. 1949). However, Judge Frank recognized that terming the reserve system "peonage" was "perhaps a bit exaggerated" and concluded that "I am not to be understood as implying that [it] violate[s] the Thirteenth Amendment or the statutes enacted pursuant thereto." Gardella v. Chandler, *supra* at 410.

In Pollock v. Williams, 322 U.S. 4, 17, 64 S.Ct. 792, 799, 88 L.Ed. 1095 (1944), the Supreme Court, reviewing a state statute authorizing criminal sanctions against any person who fails to perform a personal service contract on which he has obtained an advance, stated that the "undoubted aim of the Thirteenth Amendment * * * was not merely to end slavery but to maintain a system of completely free and voluntary labor throughout the United States." Following that general proposition, the Supreme Court in *Pollock* specified its holding with respect to peonage and the Thirteenth Amendment:

"Whatever of social value there may be, and of course it is great, in enforcing contracts and collection of debts, Congress has put it beyond debate that no indebtedness warrants a suspension of the right to be free from compulsory service. This congressional policy means that no state can make the quitting of work any component of a crime, or make criminal sanctions available for holding unwilling persons to labor." *Id.* at 18, 64 S.Ct. at 799.

Similarly, with regard to involuntary servitude and the Thirteenth Amendment, the Supreme Court in Hodges v. United States, 203 U.S. 1, 16, 27 S.Ct. 6, 8, 51 L.Ed. 65 (1906) stated:

"The things denounced are slavery and involuntary servitude. * * * All understand by these terms a condition of enforced compulsory service of one to another."

Our Circuit has held that threats of deportation in order to retain an employee's services do not constitute hold-

ing to involuntary servitude within the proscription of 18 U.S.C. § 1584, the statute relied on by plaintiff. See United States v. Shackney, 333 F.2d 475 (2d Cir. 1964). The court sought to avoid bringing the criminal law into play "whenever an employee asserts that his will to quit has been subdued by a threat which seriously affects his future welfare but as to which he still has a choice, however painful." *Id.* at 487. Involuntary servitude is defined therein as follows:

"But a holding in involuntary servitude means to us action by the master causing the servant to have, or to believe he has, no way to avoid continued service or confinement, * * *" *Id.* at 486.

A showing of compulsion is thus prerequisite to proof of involuntary servitude. Concededly, plaintiff is not compelled by law or statute to play baseball for Philadelphia. We recognize that, under the existing rules of baseball, by refusing to report to Philadelphia plaintiff is by his own act foreclosing himself from continuing a professional baseball career, a consequence to be deplored. Nevertheless, he has the right to retire and to embark upon a different enterprise outside organized baseball. The financial loss he might thus sustain may affect his choice, but does not leave him with "no way to avoid continued service. * * *" *Id.* Therefore, as stated in Wicks v. Southern Pacific Co., 231 F.2d 130, 138 (9th Cir. 1956):

"There is no contention that appellants cannot freely leave their employment with the railroads. * * * While leaving their present employment would entail serious losses in terms of seniority rights, medical benefits and retirement benefits, the fact remains that appellants are not being compelled or coerced to work against their will for the benefit of another."

Accordingly, we find that plaintiff has not satisfied the essential element

of this cause of action, a showing of compulsory service.

### The Conflicts Are Reconcilable

Before concluding this opinion, we wish to unburden ourselves of two strong and related convictions which we took away from this trial. First, despite the opposing positions of plaintiff and the Major League Baseball Players' Association on the one hand, the present management and club owners of organized baseball on the other, we found the witnesses appearing on behalf of both sides in the main credible and of high order; they have a genuine enthusiasm for baseball and with constancy have the best interests of the game at heart.[16]

Second, we are convinced that the conflicts between the parties are not irreconcilable and that negotiations could produce an accommodation on the reserve system which would be eminently fair and equitable to all concerned—in essence, what is called for here is continuity with change.

This issue is not so unique or complex and the parties are not at such loggerheads that negotiations could not succeed. What we have already said under "The Reserve System, A Necessity?," effectively supports this conclusion. Trial testimony developed several proposed modifications that could serve as bases from which negotiations might proceed toward an accommodation of the valid interests of both sides. See note 12, *supra*.

Plaintiff's witnesses expressed a belief that this matter was capable of being resolved by good faith bargaining between the parties. Thus, Mr. Miller, executive director of the Major League Baseball Players' Association, recited the various modifications suggested by the players and declared a continuing desire to resolve this dispute. Tr. 1901. He summed up the Association's bargaining position at the various meetings held with management regarding the reserve system as follows:

"Basically * * * it was our position that the reserve rule system was illegal in that its restrictions were just about total, that it was inconceivable to us that you could have a game of baseball with no rules, but that it seemed quite reasonable to us that modifications which were less restrictive than the present system could be made, were practical, and presumably could make the system safe from attack in terms of its illegality." Tr. 1904.[17]

---

16. This is true no less of the club owners than of the players. Hall of Fame immortal Henry Greenberg who participated in baseball first as a player and then as an owner-manager stated, "[the public] has the idea that the owners are just people primarily interested in profits, no concern for the players, which is not true." Tr. 237. We found the testimony of Mr. Kauffman, owner of the Kansas City Royals, fairly reflective of club owners who appeared before us:

"My number one reason for buying a baseball club was to help Kansas City retain it, and this was an opportunity for me to return to my community some of the benefits which I had reaped.

No. 2 would be the pleasure involved in being a major league owner.

No. 3 would be the prestige, and I presume this is approximate.

And No. 4 would be because I felt I could make it profitable over a period of time. * * *" Tr. 1522.

17. Further, Mr. Greenberg testified on plaintiff's behalf:

"* * * I think that the players recognize that the club should have some hold on them and I feel that it should be very simple to negotiate a term or a period of time in which the player is signed to a club and he has no rights to leave until that period has expired.

* * * * *

* * * I think it can be done in many, many ways and the game would continue to function and operate and the players would be probably more satisfied and I think it would be best for all interests concerned." Tr. 247, 248.

In this same vein, Mr. Veeck, a former club owner long associated with baseball called by plaintiff as a rebuttal witness, asserted:

"* * * I don't believe that most athletes want anything but a change, a small change, a step in a direction. * * *" Tr. 1976.

The Major League Baseball Players' Association, organized in 1954, has proved a particularly effective bargaining representative obtaining since 1966 highly significant benefits for the players in such areas as pensions, life and disability insurance, health care, minimum salary, arbitration of grievances, expense allowances, maximum permissible salary cut, termination pay, representation at individual salary negotiations, negotiation of rule changes affecting player benefits or obligations, due process in player discipline. See Defendants' Feeney Exhibits F, M and N in evidence. Both management and the Players' Association recognize · the reserve system to be a mandatory subject of collective bargaining. The National Labor Relations Board asserted jurisdiction over organized baseball in December, 1969.

The history of negotiations to date does not appear to us to establish, as plaintiff appears to contend, that organized baseball refuses to bargain with regard to the reserve system and will accept no modification of its structure un-less forced to do so by the courts or by Congress. In the first place, several of the benefits mentioned above are directed at alleviating some of the undesirable side effects of the reserve system. Moreover, serious negotiations aimed at the core of this system are of quite recent origin and the failure to reach a quick accord should not be seen, in our opinion, as indicating intransigence on either or both sides.

While it is true the owners have continued to support the status quo of the reserve system and have been critical of the various proposals by the Players' Association for its elimination or modification, they have not closed the door entirely on various suggestions made during negotiations in the immediate past in efforts to ameliorate the objectionable features of the reserve clause. Indeed, Commissioner Kuhn in his testmony at this trial indicated that, "changes that could be made are changes that are best bargained out between parties that are involved here * * *" And representatives of the club owners expressed substantially similar views.[18]

Finally, cross-examination of plaintiff elicited:
"Q And if Mr. Miller succeeded in inducing the clubs to modify the reserve clause, would you drop this lawsuit?
A [Flood] Yes, I would."
Tr. 116.

18. In August, 1967 the Players' Association included within its Statement of Policy, containing various proposals for discussion with the club owners, a passage broadly stating that the reserve system is of doubtful legality and calling for a reasoned, open-minded approach toward some accommodation. Defendants' Feeney Exhibit O, pp. 5–6. The first Basic Agreement between the clubs and the Players' Association executed on February 19, 1968 provided for a joint study of the reserve system during the two year term of the agreement. Defendants' Feeney Exhibit F, Article VIII. At least four meetings were held at which ideas were discussed but no specific proposals made. Tr. 1593–94, 1918. No joint report issued, but the Players' Association prepared a written critique of the reserve system on June 27, 1969. Defendants' Feeney Exhibit Q in evidence.

On August 29, 1969, the Players' Association submitted proposals for various changes in the Basic Agreement. With respect to the reserve system, its very general proposal sought only "alternative provisions" which would be legal, reasonable, and responsive to the legitimate interests of players and club owners. Defendants' Feeney Exhibit P, pp. 1–2. On October 31, 1969, the Players' Association made, apparently for the first time, a specific proposal in the nature of a binding offer for change in the reserve system. Defendants' Feeney Exhibit R in evidence. This proposal for free agency status for players every three years with the original club retaining a right of first refusal was rejected by the clubs in December, 1969. Tr. 1607. Thereafter, other modifications suggested by the players including the National Football League option clause were discussed. The club owners continued to take a bargaining position in support of the status quo. Discussions continued on all aspects of the new agreement including the reserve system until February 19, 1970 when the Players Association and the clubs, with the final termination date of the old agreement drawing near, stipulated that nei-

In such matters as labor relations and family disputes, to name just two, Congress (in the case of collective bargaining) and the courts have determined that such disputes as do arise therein are best resolved by the parties without outside interference and that resort to a court-imposed solution should be a matter of last resort. This is almost invariably the case whenever two parties must continue to work together amicably toward a common end after the dispute is settled. This is not to hold that the court should adopt a similar hands-off approach toward this case. Nevertheless, we believe that here, as well, the parties themselves are best able to reach a satisfactory accord, and that all avenues toward such an approach certainly have not yet been fully exhausted.

From the trial record and the sense of fair play demonstrated in the main by the witnesses on both sides, we are convinced that the reserve clause can be fashioned so as to find acceptance by player and club.

. Far more complicated matters accompanied by an exclusive self-centered concern and by seemingly hostile and irreconcilable attitudes, frequently find their way to amicable adjustment and the abandonment of court claims. Why not here—with the parties positive and reasonable men who are equally watchful over a common objective, the best interests of baseball?

## Conclusion

For the first time in almost fifty years opponents and proponents of the baseball reserve system have had to make their case on the merits and support it with proof in a court of law. As a long line of litigation and congressional inquiry attests, this system has often been a center of controversy and a source of friction between player and club. Existing and, as we see it, controlling law renders unnecessary any determination as to the fairness or reasonableness of

---

ther party would be required to bargain on the reserve sytem until the instant lawsuit is finally adjudicated or discontinued. Defendants' Feeney Exhibit N, Attachment B, in evidence. This is the posture in which matters still stand. While defendants continued to support the status quo and to criticize the modifications suggested by plaintiff at trial, they also reflected a readiness to continue to negotiate toward an accommodation. Commissioner Kuhn testified:

"Obviously the changes that could be made are changes that are best bargained out between parties that are involved here, such as the clubs and the players. * * * There have been many changes in the workings of the waiver rule, changes in the workings of the option provision, changes in the workings of the minimum salary provisions and so forth.

The reserve system has been an evolving system, and I expect it to continue to be an evolving system." Tr. 806.

Mr. Feeney, President of the National League, affirmed the following:

"Q Now, Mr. Greenberg testified that, 'the reason for my being here, Judge, is that I think this has to be worked out between the owners and the players."

Wouldn't you agree with Mr. Greenberg on that point?

A [Feeney] Yes, I would." Tr. 985.

American League President Joseph Cronin noted:

" * * * one of the things [the late owner of the Washington Senators] taught me was to always keep negotiations going. * * * Never say take it or leave it. Always say 'might consider,' and that is the practice I have maintained throughout my years in baseball." Tr. 1192.

Mr. Gaherin, chief negotiator for the club owners, responded affirmatively when asked if "the clubs recognize that the reserve system is a mandatory subject of bargaining upon which the clubs are legally obligated to bargain with the [Players'] Association." Tr. 1579. Further on he opined:

" * * * we certainly have all of the ability in the two sides to sit down and in the free area of collective bargaining resolve a matter of this nature.

And I may say parenthetically, if I may, Judge, we are quite willing to do so." Tr. 1616.

this reserve system.[19] We are bound by the law as we find it and by our obligation to "call it as we see it."

Although a resolution of the merits of the reserve system would be inappropriate at this time, it is nevertheless our hope that by obtaining a complete record covering not only the threshold question of whether plaintiff states a cause of action, but the merits of his claims as well, we may have obviated the possibility of piecemeal determinations and consequent delay.

The foregoing opinion constitutes this Court's findings of fact and conclusions of law pursuant to Rule 52(a), F.R.Civ. P.

For the reasons already set forth, the Clerk is directed to enter judgment in favor of defendants and against plaintiff on each cause of action herein.

So ordered.

19. Admission into evidence of plaintiff's exhibits 28, 29 and 34 for identification is contested. Since we do not reach the merits of the reserve system, resolution of their admissibility is unnecessary. Assuming *arguendo* that such exhibits were in evidence, our decision herein would be unaffected.